**DGR ASSOCIATES, INC., Plaintiff,**

v.

**UNITED STATES, Defendant,**

and

**General Trades & Services, Inc., Defendant–Intervenor.**

No. 10–396C.

United States Court of Federal Claims.

Aug. 13, 2010.

Darcy V. Hennessy, with whom was Leslie A. Boe, Hennessy and Boe, P.A., Mission, Kansas, for Plaintiff.

Steven M. Mager, with whom were Tony West, Assistant Attorney General, Jeanne E. Davidson, Director, and Patricia M. McCarthy, Assistant Director, United States Department of Justice, Commercial Litigation Branch, Civil Division, Washington, D.C., Christopher S. Cole, Department of the Air Force, and David A. Fishman, Small Business Administration, Of Counsel, for Defendant.

Wayne A. Keup, Wayne A. Keup, PLLC, Washington, D.C., for Defendant–Intervenor.

### OPINION AND ORDER

WHEELER, Judge.

In this bid protest, Plaintiff DGR Associates, Inc. ("DGR") challenges the Department of the Air Force's decision to conduct an 8(a) program small business set-aside procurement for housing maintenance, inspection, and repair services at Eielson Air Force Base, Alaska. DGR contends that the Air Force violated the Small Business Act, 15 U.S.C. § 657a(b)(2)(B) (2006), by not giving priority to HUBZone small business concerns when there is a reasonable expectation that two or more such concerns would submit offers and that the award could be made at a fair market price. DGR is a qualified HUBZone small business concern, but is not eligible to compete under the 8(a) program. DGR prevailed in a timely bid protest at the Government Accountability Office ("GAO"), but the Air Force announced that it would not follow the GAO's recommended decision. DGR then filed suit in this Court, requesting declaratory and injunctive relief. The Air Force awarded the contract under the 8(a) set-aside procurement to Defendant–Interve-

nor General Trades & Services, Inc. Defendant represented that the Air Force suspended performance of the contract pending the Court's ruling in this case.

Defendant opposes DGR's protest, arguing that the lawsuit is untimely because it was not filed before the closing date for receipt of proposals, citing *Blue & Gold Fleet L.P. v. United States,* 492 F.3d 1308 (Fed.Cir.2007). Defendant also argues that, under the Small Business Administration's regulations, the Air Force was not required to give any priority to HUBZone small business concerns. The outcome of this dispute turns on the interpretation of the statutory language that Congress used to establish the section 8(a) and HUBZone small business programs. Despite executive agency memoranda to the contrary, this Court and the GAO have held that the plain meaning of the Small Business Act mandates a priority to the HUBZone program. *Mission Critical Solutions v. United States,* 91 Fed.Cl. 386 (2010), *appeal docketed,* No.2010–5099 (Fed.Cir. Apr. 2, 2010); *DGR Assocs., Inc.,* B–402494, 2010 CPD ¶ 115 (Comp.Gen. May 14, 2010); *Mission Critical Solutions,* B–401057, 2009 CPD ¶ 93 (Comp.Gen. May 4, 2009); *Int'l Program Group, Inc.,* B–400278 *et al.,* 2008 CPD ¶ 172 (Comp.Gen. Sept. 19, 2008). The Ninth Circuit has reached a similar conclusion, giving priority to the HUBZone program. *Contract Mgmt., Inc. v. Rumsfeld,* 434 F.3d 1145, 1149 (9th Cir.2006).

The Court has before it Defendant's and Defendant–Intervenor's motions to dismiss for lack of jurisdiction, and the parties' cross-motions for judgment on the administrative record. For the reasons stated below, the Court sustains DGR's protest. DGR has not waived its right to challenge the Air Force's section 8(a) solicitation because it followed required protest procedures at the agency level and at the GAO before filing suit in this Court. *Blue & Gold Fleet* does not require a protester raising a solicitation impropriety to file suit before the closing date for receipt of proposals, provided that timely challenges first have been made at the agency or before the GAO. *See* 492 F.3d at 1313, and "Discussion," Part A, below.

On the issue of statutory interpretation, the language of the Small Business Act granting priority to the HUBZone program could not be more clear. By using the phrases "notwithstanding any other provision of law ... a contract opportunity shall be awarded on the basis of competition to qualified HUBZone small business concerns," Congress established a priority for the HUBZone program over other competing small business programs. *See* 15 U.S.C. § 657a(b)(2)(B). If Congress intended something different from what it stated, Congress alone must enact an appropriate amendment, as this Court can only apply the laws as written. *See, e.g., Conn. Nat'l Bank v. Germain,* 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there."). The executive agency memoranda reflecting disagreement with this interpretation, more than anything, simply express disbelief that Congress could have intended a priority for the HUBZone program.[1] These agencies would be better served to seek legislative relief from Congress rather than judicial relief in this Court.

With the issuance of this decision, the Court permanently enjoins Defendant from proceeding with the contract unlawfully awarded to General Trades & Services, and from awarding any contract that is not in compliance with the Small Business Act as interpreted herein.

### The Small Business Act

Congress enacted the Small Business Act ("the Act") to "aid, counsel, assist, and protect, insofar as is possible, the interests of small-business concerns." 15 U.S.C. § 631(a) (2006). The Small Business Administration ("SBA") is charged with carrying out the policies of the Act and with promulgating the necessary rules and regulations to fulfill its

---

1. The referenced executive agency memoranda consist of: (1) Office of Management and Budget Memorandum, dated July 10, 2009; (2) Department of Justice, Office of Legal Counsel, Memorandum, dated August 21, 2009; and (3) Office of the Under Secretary of Defense, Director, Defense Procurement and Acquisition Policy, Memorandum, dated May 18, 2010.

statutory responsibilities. *Id.* §§ 633(a), 634(b).

To further the goal of aiding small businesses, Congress has established certain programs to assist qualifying small businesses in obtaining "a fair proportion" of Federal contracts.[2] *Id.* §§ 631(a), 637(a)(1)(C), 657a. Two of the Act's programs are relevant to this case: (1) the 8(a) Business Development Program, which assists those firms owned and controlled by socially and economically disadvantaged individuals, 15 U.S.C. § 637; and (2) the HUBZone Program, which assists those small businesses operating in a "historically underutilized business zone." *Id.* §§ 632(p)(2), 657a.

### A. 8(a) Business Development Program

Congress established the 8(a) Business Development Program through an amendment to the Act in 1978. Pub.L. No. 95–507, §§ 201–202, 92 Stat. 1757, 1761 (1978) (codified as amended at 15 U.S.C. § 637). The program's stated purpose is to "promote the business development of small business concerns owned and controlled by socially and economically disadvantaged individuals." 15 U.S.C. § 631(f)(2). It also "expand[ed] the program for the procurement by the United States of articles, supplies, services, materials, and construction work from small business concerns owned by socially and economically disadvantaged individuals." *Id.* The Act defines socially disadvantaged individuals as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities." *Id.* § 637(a)(5). "Economically disadvantaged individuals" are defined as those "whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged." *Id.* § 637(a)(6)(A).

The Act sets a government-wide contracting goal for the 8(a) program of "not less than 5 percent of the total value of all prime contract and subcontract awards for each fiscal year." *Id.* § 644(g)(1). Pursuant to the Act, the SBA is empowered to enter into contracts with federal procurement agencies to furnish goods and services and then to "arrange for the performance of such procurement contracts by negotiating or otherwise letting subcontracts to socially and economically disadvantaged small business concerns...." 15 U.S.C. § 637(a)(1)(A)-(B). SBA's authority to award an 8(a) contract is conditioned on the requirement that the award be made as a result of an offer submitted in response to a published solicitation "relating to a competition conducted pursuant to subparagraph (D)." *Id.* § 637(a)(1)(C)(i). Subparagraph (D)(i) provides:

> A contract opportunity offered for award pursuant to this subsection shall be awarded on the basis of competition restricted to eligible Program Participants if (I) there is a reasonable expectation that at least two eligible Program Participants will submit offers and that award can be made at a fair market price....

*Id.* § 637(a)(1)(D)(i)(I). A contracting officer's decision to set aside a contract opportunity under the 8(a) program is discretionary. *Id.* § 637(a)(1)(A). The SBA also must agree that competition for the procurement be limited to those firms participating in the 8(a) program. *Id.* If the contracting officer decides not to make the contract available for award under the 8(a) program or the contracting officer and the SBA disagree over the terms and conditions of a contract to be awarded, the SBA Administrator may appeal the agency's decision. *Id.* A contract may not be awarded to an 8(a) small business if "the award of the contract would result in a cost to the awarding agency which exceeds a fair market price." *Id.*

**2.** "It is the policy of the United States that small business concerns, small business concerns owned and controlled by veterans, small business concerns owned and controlled by service-disabled veterans, qualified HUBZone small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women, shall have the maximum practicable opportunity to participate in the performance of contracts let by any Federal agency...." 15 U.S.C. § 637(d)(1).

## B. *HUBZone Program*

The Small Business Reauthorization Act of 1997 added the HUBZone Program to the Small Business Act in order to assist small businesses operating in a "historically under-utilized business zone," defined as an area located within one or more qualified census tracts, non-metropolitan counties, Indian reservations, or base closure areas. *See* Pub.L. No. 105–135, § 602(b)(1)(B), 111 Stat. 2592, 2627 (codified as amended at 15 U.S.C. § 657a). The SBA is responsible for administering the HUBZone program. 15 U.S.C. § 657a(a).

To qualify for the program, a company must have its principal office in a HUBZone area and at least 35 percent of the company's employees must reside in a HUBZone. *Id.* § 632(p)(5). A qualified HUBZone small business is eligible to receive federal contracts on a sole-source basis, through competition restricted to HUBZone concerns, or through a ten percent pricing preference for contracts awarded on the basis of full and open competition. *Id.* § 657a(b)(2)-(3).

Under the HUBZone program, a contracting officer must award on the basis of competition restricted to qualified HUBZone small businesses if certain conditions are met. Specifically, subparagraph (b)(2)(B) of Section 657a states:

> *Notwithstanding any other provision of law* ... a contract opportunity *shall* be awarded pursuant to this section on the basis of competition restricted to qualified HUBZone small business concerns if the contracting officer has a reasonable expectation that not less than 2 qualified HUBZone small business concerns will submit offers and that the award can be made at a fair market price.

*Id.* § 657a(b)(2)(B) (emphasis added). The two conditions set forth in this provision—"a reasonable expectation that not less than 2 qualified HUBZone small business concerns will submit offers" and "that the award can be made at a fair market price"—are commonly referred to as "the rule of two." *See id.*

---

3. The relevant facts of this case are not in dispute, and are taken from the administrative record, Plaintiff's complaint, and the parties' memo-

If the rule of two is not satisfied, the HUBZone program provides that a contracting officer, "[n]otwithstanding any other provision of law," 15 U.S.C. § 657a(b)(2), *may* award a sole source contract to any qualified HUBZone small business concern if:

> "... the qualified HUBZone small business concern is determined to be a responsible contractor with respect to performance of such contract opportunity, and the contracting officer does not have a reasonable expectation that 2 or more qualified HUBZone small business concerns will submit offers for the contracting opportunity...."

*Id.* § 657a(b)(2)(A)(i).

In addition, similar to the 8(a) program, the SBA Administrator may appeal a contracting officer's decision to "not award a contract opportunity under this section to a qualified HUBZone small business concern." *Id.* § 657a(b)(2)(C). The HUBZone statute further provides that a "Government-wide goal for participation by qualified HUBZone small business concerns shall be established at ... not less than 3 percent of the total value of all prime contract awards for fiscal year 2003 and each fiscal year thereafter." *Id.* § 644(g)(1).

### *Factual Background* [3]

Plaintiff DGR is the incumbent contractor for maintenance, inspection, and repair services in military family housing at Eielson Air Force Base, Alaska (the "Base"). Admin. R. ("AR") 424–25. DGR performed the military housing maintenance services pursuant to a five-year firm fixed price contract, which expired in 2009. AR 904, 909. After the expiration of the five-year contract, DGR performed the services pursuant to work orders under a Blanket Purchase Agreement ("BPA"). AR 982. On June 14, 2010, the Air Force notified DGR that it was terminating DGR's BPA effective July 15, 2010. *Id.* DGR is a qualified HUBZone small business concern. AR 425.

randa in support of their motions for judgment on the administrative record.

## A. The Initial Solicitation Set Aside for HUBZone Small Businesses

On January 9, 2009, the Air Force issued a competitive solicitation for maintenance, inspection, and repair services at the Base in Alaska. *See* Pl.'s July 9, 2010 Mot. 4; *see also* Solicitation No. FA5004–09–R–0001 (reposted as Solicitation No. FA5004–09–R–C014 on April 1, 2009) ("Solicitation I"). The Air Force set aside Solicitation I for qualified HUBZone small business concerns. AR 419. At least four offerors submitted proposals in response to Solicitation I. *Id.* On June 4, 2009, the Air Force awarded the contract to Inuit Services, Inc. (Pl.'s July 9, 2010 Mot. 5.)

DGR protested the eligibility of Inuit Services at the SBA, whereupon Inuit Services admitted that it was not a qualified HUBZone small business concern. *Id.; see also Size Appeal of Inuit Services, Inc.,* SBA No. SIZ–5079 (Oct. 9, 2009). The Air Force withdrew the award to Inuit Services and cancelled Solicitation I. (Pl.'s July 9, 2010 Mot. 5.) Solicitation I is not in dispute in this case.

## B. The Re-issued Solicitation Set Aside for 8(a) Program Participants

Before issuing its second solicitation ("Solicitation II"), the Air Force, in coordination with the SBA, conducted market research to determine the best method of procuring a follow-on contract for military housing maintenance services at the Base. AR 1–17. The Air Force's research revealed that it could set the solicitation aside either for qualified HUBZone concerns or 8(a) small businesses. AR 5. However, the contracting officer determined that it was in the best interests of the Air Force to offer the contract for an 8(a) competition. Specifically, in an October 27, 2009 "Market Research Analysis Report," the contracting officer stated: "Based on the 354th Contracting Squadron failing to meet its [fiscal year 2009] mandated [small disadvantaged business] goal and far exceeding their HUBZone goal, it has been determined to be in our best interest to set this procurement aside as a competitive 8(a)." *Id.* The contracting officer further observed that the Air Force had "exceeded our HUBZone goals by over 600% and missed our small disadvantaged business (SBD, includes 8(a)s) by 53%." AR 423, 506.

On December 2, 2009, the Air Force posted a synopsis of Solicitation II, which sought a cost reimbursable requirements contract for Base family housing maintenance services. AR 55–206. Solicitation II limited the pool of offerors to qualified 8(a) small businesses and set January 25, 2010 as the response date for the submission of proposals. AR 55–59. Solicitation II included a one-year base period and two one-year option periods. The base period was to run from March 1, 2010 to February 28, 2011. *Id.*

On December 16, 2009, DGR requested the Air Force set-aside Solicitation II for qualified HUBZone small business concerns rather than 8(a) program participants. AR 24–25. DGR argued that 15 U.S.C. § 657a required the Air Force to award Solicitation II under the HUBZone program. *Id.* In support of its position, DGR cited the GAO's decision in *Mission Critical Solutions,* B–401057, 2009 CPD ¶ 93 (Comp.Gen. May 4, 2009), which concluded that an agency could not proceed with an 8(a) program award without first considering whether a set-aside to a qualified HUBZone small business concern is required. AR 25–31. The Air Force responded that the GAO's *Mission Critical* decision was not binding, and that it therefore would proceed with a competitive section 8(a) set-aside. AR 32–47, 444–57, 949–62. The Air Force attached to its response an August 2009 memorandum from the Department of Justice, Office of Legal Counsel ("OLC") issued in reaction to the GAO's *Mission Critical* decision. AR 32–47 (Memorandum from Jeannie S. Rhee, Deputy Assistant Attorney Gen., Office of Legal Counsel, Dep't of Justice (Aug. 21, 2009)). In this memorandum, the OLC concluded that the Small Business Act "does not compel SBA to prioritize the HUBZone Program [over the 8(a) Program] in the manner GAO determined to be required." AR 35, 38–45. The OLC further explained that its opinion was binding on all executive agencies, notwithstanding any GAO decision to the contrary. AR 46–47.

The Air Force issued Solicitation II as a section 8(a) set-aside on December 22, 2009,

with proposals due on January 25, 2010. AR 60–206 (Solicitation No. FA5004–10–R–0001). Solicitation II provided that the successful offeror was to supply all management, supervision, personnel, labor, equipment, vehicles, service calls, materials, tools and other items and services necessary to perform maintenance to 1,184 military family housing units at the Base. AR 61–75.

## C. *DGR's Agency–Level And GAO Protests*

On January 22, 2010, DGR filed an agency-level protest with the Air Force, protesting its failure to set aside Solicitation II for qualified HUBZone small business concerns. AR 415–22. DGR requested the Air Force postpone the closing date for receipt of proposals pending the determination of its protest. AR 422. The Air Force did not postpone the closing date, and proposals were received on January 25, 2010, as required by Solicitation II. AR 424. The agency formally denied DGR's protest on February 4, 2010. AR 423.

DGR protested to the GAO on February 4, 2010. AR 424–32. DGR asserted: (1) "Federal law requires this Solicitation [to] be set aside for qualified HUBZone companies;" (2) "The procedure for selection for award is inconsistent with the stated evaluation factors;" (3) "The Solicitation Performance Work Statement is ambiguous and requires bidders to unnecessarily speculate as to significant work requirements;" and, (4) "DGR was prejudiced by the Air Force's actions." AR 427. DGR later dismissed the second and third grounds of its protest after a senior attorney at the GAO advised DGR through "outcome prediction" that it likely would not prevail on those grounds. AR 918. On March 5, 2010, the Air Force informed the GAO that because "[i]t is Air Force Policy to comply with the OLC opinion not to provide priority to HUBZones but rather to treat them with parity with the other small business programs," the Air Force "will not comply with a GAO opinion contrary to that policy." AR 489.

On May 14, 2010, the GAO sustained DGR's protest. AR 921–25; *see DGR Assocs., Inc.*, B–402494.1, 2010 CPD ¶ 115 (Comp.Gen. May 14, 2010). The GAO held that the Air Force had to consider whether it could expect two or more qualified HUBZone small business concerns to submit proposals at a fair market price, in accordance with the "plain language of the HUBZone statute." AR 921–23. The GAO further concluded that, if the Air Force could expect two or more qualified HUBZone small business concerns to submit proposals at a fair market price, then it must cancel Solicitation II and issue a new solicitation as a HUBZone set-aside. *Id.*

## D. *DGR's Request For Fees And Costs*

The GAO awarded DGR its fees and costs of filing and pursuing the protest. AR 923. On May 24, 2010, DGR submitted to the Air Force a request for payment of its fees and costs. AR 934–42. The Air Force refused DGR's request. AR 943. On June 8, 2010, DGR submitted its request to the GAO for determination. AR 969–81. DGR's request is still pending at the GAO. *See* AR 983–93 (documenting Air Force's June 14, 2010 response to the GAO); *see also* Pl.'s July 9, 2010 Mot. 7.

## E. *Air Force's Contract Award to General Trades & Services*

On May 27, 2010, the Air Force informed the GAO in a letter that it would not comply with the GAO's decision sustaining DGR's protest. AR 945–46. The Air Force contended that memoranda from the Office of Management and Budget and the Department of Justice constituted "binding" and "mandatory" guidance on the prioritization of HUBZone small business concerns. *Id.* These memoranda directed executive agencies, including the Air Force, to follow 13 C.F.R. §§ 126.605 and 126.607, and to place qualified HUBZone small business concerns and section 8(a) program participants on an equal footing for the award of contracts. AR 945–65.

The Air Force notified DGR on June 14, 2010 that it would terminate DGR's work order effective July 15, 2010. AR 982. On June 15, 2010, DGR requested the Air Force to identify the new contractor who would provide the services, and the Air Force's

method of procuring the contract. *See* Pl.'s July 9, 2010 Mot. 8; *see also* Pl.'s TRO Mem. 155–56. The Air Force responded on June 16, 2010, stating that: (1) it "intends to award a contract and not a BPA;" (2) "the name of the potential awardee cannot be released at this time;" and (3) "no explanation [is] needed, for we will award a new contract, not a BPA." (Pl.'s TRO Mem. 155.) The Air Force announced a "competitive 8(a) set-aside" award to General Trades & Services on June 17, 2010. AR 994. On June 28, 2010, DGR filed its suit in this Court.

*Bid Protest Jurisdiction and Applicable Standards of Review*

The Court of Federal Claims has jurisdiction to review pre-award and post-award bid protests pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(1)(2006), as amended by the Administrative Dispute Resolution Act of 1996, Pub.L. No. 104–320, § 12(a)-(b)(1996). The Court reviews bid protests under the standards set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. *See* 28 U.S.C. § 1491(b)(4); *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed.Cir.2004). The APA provides that an agency's decision is to be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *Banknote Corp. of America, Inc. v. United States*, 365 F.3d 1345, 1350 (Fed.Cir.2004); *Tech. Sys., Inc. v. United States*, 50 Fed.Cl. 216, 222 (2001). Therefore, "a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure." *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed.Cir.2001).

DGR's bid protest is based upon an alleged violation of law. When challenging a procurement on this ground, "the disappointed bidder must show a clear and prejudicial violation of applicable statutes or regulations." *Impresa*, 238 F.3d at 1333. In pre-award protests, the protester can establish prejudice by showing "a non-trivial competitive injury which can be redressed by judicial relief." *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1361 (Fed.Cir.2009)

(quoting *WinStar Commc'ns, Inc. v. United States*, 41 Fed.Cl. 748, 763 (1998)). In post-award protests, the protester must establish prejudice by showing that there was a "substantial chance" it would have received the contract award absent the alleged violation. *See Bannum, Inc. v. United States*, 404 F.3d 1346, 1353 (Fed.Cir.2005) (citing *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed.Cir.2003)). A protester is "not required to show that, but for the alleged error, the protester would have been awarded the contract." *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996).

A. *Motion to Dismiss for Lack of Subject Matter Jurisdiction*

In ruling on Defendant's motion to dismiss for lack of subject matter jurisdiction, this Court is "obligated to assume all factual allegations to be true and to draw all reasonable inferences in plaintiff's favor." *Henke v. United States*, 60 F.3d 795, 797 (Fed.Cir.1995) (citing *Scheuer v. Rhodes*, 416 U.S. 232, 236–37, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) and *Catawba Indian Tribe v. United States*, 982 F.2d 1564, 1568–69 (Fed.Cir. 1993)). The non-moving party bears the burden of establishing jurisdiction by a preponderance of evidence. *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 748 (Fed.Cir.1988). In ruling on the motion to dismiss, this Court is not confined to the complaint, but can consider "'evidentiary matters outside the pleadings.'" *Thomas v. United States*, 34 Fed.Cl. 619, 621 (1995) (quoting *Indium Corp. of America v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed.Cir. 1985)). Dismissal is appropriate when the Court lacks jurisdiction over the subject matter. *See* Rules of the Court of Federal Claims ("RCFC")12(b)(1).

B. *Motion for Judgment on The Administrative Record*

Pursuant to RCFC 52.1, the parties have filed cross-motions for judgment on the administrative record, requiring the Court to conduct a proceeding akin to an expedited trial on the record. *See* RCFC 52. 1, Rules Committee Note (July 13, 2009) ("Summary judgment standards are not per-

tinent to judicial review upon an administrative record."); *see also Bannum*, 404 F.3d at 1356; *A & D Fire Prot., Inc. v. United States*, 72 Fed.Cl. 126, 131 (2006). The Court reviews a motion for judgment on the administrative record to determine whether "given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record." *DMS All–Star Joint Venture v. United States*, 90 Fed.Cl. 653, 661 (2010) (citing *Bannum*, 404 F.3d at 1355–56). In other words, in evaluating the parties' cross-motions, the Court considers whether the "protestor has met its burden of proof that an award is arbitrary, capricious . . . or violates to prejudicial effect an applicable procurement regulation." *Tech. Sys.*, 50 Fed.Cl. at 222.

 The Court may make findings of fact where necessary. *Bannum*, 404 F.3d at 1356. The existence of a material issue of fact, however, does not prohibit the Court from granting a motion for judgment on the administrative record, and the Court is not required to conduct an evidentiary proceeding. *See id.* at 1357 (instructing the Court of Federal Claims to make factual findings under RCFC 52 "as if it were conducting a trial on the record"). In this case, the relevant facts are not in dispute.

## Discussion

### A. DGR Did Not Waive Its Right to Bring Suit in This Court.

Defendant and the awardee, General Trades & Services, argue that the Court lacks jurisdiction over DGR's protest because DGR did not file suit in this Court until well after the closing date for receipt of proposals. They contend that, to challenge a defect in the procuring agency's solicitation, the protester must file suit in the Court of Federal Claims before the close of the bidding process. (Def.'s July 9, 2010 Mot. 20–27; Defendant–Intervenor's July 9, 2010 Mot. 3–6.) They principally rely upon three cases in support of their proposition: *Blue & Gold Fleet L.P. v. United States*, 492 F.3d 1308 (Fed.Cir.2007); *Weeks Marine, Inc. v. United States*, 575 F.3d 1352 (Fed.Cir.2009); and *Esterhill Boat Service Corp. v. United States*,

91 Fed.Cl. 483 (2010), *appeal docketed*, No.2010–5074 (Fed.Cir. Feb. 16, 2010).

A protest of an alleged defect in an agency's solicitation can be lodged in different venues. A prospective offeror can file an "agency-level protest" by protesting to the procuring agency that a flaw in the solicitation should be remedied. Federal Acquisition Regulation ("FAR"), 48 C.F.R. § 33.103 (2010). An agency-level protest based upon an alleged impropriety in a solicitation must be filed with the agency "before bid opening or the closing date for receipt of proposals." *Id.* § 33.103(e). Prior to filing a protest, federal procurement policy encourages parties to resolve concerns "at the contracting officer level through open and frank discussions." *Id.* § 33.103(b). Procurement regulations stress that the agency "should provide for inexpensive, informal, procedurally simple, and expeditious resolution of protests," and that "[w]here appropriate, the use of alternate dispute resolution techniques, third party neutrals, and another agency's personnel are acceptable protest resolution methods." *Id.* § 33.103(c). The agency-level procedures are intended "to resolve agency protests effectively, to build confidence in the Government's acquisition system, and to reduce protests outside of the agency[.]" *Id.* § 33.103(d).

A prospective offeror also may file a protest of a solicitation defect at the GAO. *See* GAO Regulations, 4 C.F.R. § 21.2(a) (2009). Protests at the GAO based upon alleged improprieties in a solicitation "shall be filed prior to bid opening or the time set for receipt of initial proposals." *Id.* § 21.2(a)(1). However, in circumstances where a protester first challenges a solicitation impropriety through an agency-level protest, a subsequent protest filed at the GAO will still be timely, even after the closing date for receipt of bids or proposals, if filed within ten days of adverse agency action:

> (3) If a timely agency-level protest was previously filed, any subsequent protest to GAO filed within 10 days of actual or constructive knowledge of initial adverse agency action will be considered, provided the agency-level protest was filed in accordance with paragraphs (a)(1) and (a)(2) of

this section, unless the contracting agency imposes a more stringent time for filing, in which case the agency's time for filing will control. In cases where an alleged impropriety in a solicitation is timely protested to a contracting agency, any subsequent protest to GAO will be considered timely if filed within the 10–day period provided by this paragraph, even if filed after bid opening or the closing date for receipt of proposals.

*Id.* § 21.2(a)(3).

A prospective offeror may file a protest at the Court of Federal Claims, without first filing an agency-level protest or a GAO protest. Also, a party may file suit at the Court of Federal Claims after protesting to the agency or to the GAO, or while agency or GAO proceedings are still pending.[4] Unlike agency-level or GAO protests, there are no regulatory time limits for filing at the Court. The Tucker Act provides the jurisdictional basis for the Court to hear bid protests, stating that the Court of Federal Claims:

> ... shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.... [The Court] shall have jurisdiction to entertain such an action without regard to whether suit is instituted before or after the contract is awarded.

28 U.S.C. § 1491(b)(1) (2006).

Faced with the above choices for challenging the Air Force's solicitation at Eielson Air Force Base, the Court will examine the timeliness of DGR's protest actions. The solicitation's closing date for receipt of proposals was January 25, 2010. AR 51–53. Under the described protest framework, the Court particularly must analyze what actions DGR took before this date, and how diligently DGR continued to press its argument thereafter.

On December 16, 2009, more than one month prior to the closing date and before the Air Force had issued the solicitation, DGR requested the Air Force to set aside the solicitation for qualified HUBZone small business concerns. AR 24–31. DGR cited the GAO's decision in *Mission Critical Solutions,* B–401057, 2009 CPD ¶ 93 (Comp.Gen. May 4, 2009), holding that a procuring agency by statute must give priority to HUBZone set-asides over other program preferences contained in the Small Business Act. *Id.* On December 17, 2009, the Air Force rejected DGR's position, relying upon the Department of Justice memorandum which concluded that agencies are not bound by the GAO's *Mission Critical Solutions* decision. AR 32. The Air Force stated that market research supported a competitive 8(a) set-aside. *Id.* The Air Force formally issued the solicitation on December 22, 2009, limiting offerors to participants enrolled in SBA's 8(a) program. AR 51.

On January 22, 2010, three days before the closing date for receipt of proposals, DGR filed an agency-level protest with the Air Force, protesting the agency's failure to set aside the solicitation for qualified HUBZone small business concerns. AR 415–22. On January 25, 2010, the Air Force went ahead with the closing date for receipt of proposals without amending the solicitation as DGR had requested. AR 51–53. DGR understood that the Air Force thereby had acted adversely to DGR's agency-level protest. *Id.*

On February 4, 2010, within ten days of the Air Force's adverse action, DGR timely filed a protest with the GAO, docketed as B–402494. AR 425–57. That same day, the Air Force issued a decision on DGR's agency-level protest, ruling that the Air Force was not obligated by law to set aside the solicitation for qualified HUBZone small business concerns. AR 423. On May 14, 2010, the GAO sustained DGR's protest. *DGR Assocs., Inc.,* B–402494, 2010 CPD ¶ 115 (Comp. Gen. May 14, 2010). The GAO ruled that the Air Force first must consider whether two or more qualified HUBZone small businesses

---

**4.** If a protester commences judicial proceedings concerning the same subject matter of a GAO protest, the GAO will dismiss any pending case involving that subject matter. *See* 4 C.F.R. § 21.11.

could be expected to submit offers, and whether award could be made at a fair market price as required by 15 U.S.C. § 657a. *Id.* The GAO recommended that the Air Force cancel the current solicitation and re-issue it as a HUBZone set-aside. *Id.* The GAO awarded DGR its attorneys' fees and costs of filing and pursuing the protest, pursuant to 4 C.F.R. § 21.8(d)(1). *Id.*

In a May 27, 2010 letter, received by DGR's counsel on June 7, 2010, the Air Force informed the GAO that it would not comply with the GAO's decision sustaining DGR's protest. AR 945–68. The Air Force stated that its action was based upon the July 10, 2009 Office of Management and Budget memorandum, the August 21, 2009 Department of Justice Office of Legal Policy memorandum, and the May 18, 2010 Defense Department memorandum, all of which the Air Force attached to its letter. *Id.* On June 17, 2010, the Air Force announced the award of a contract to General Trades & Services. AR 994. DGR filed suit in this Court for declaratory and injunctive relief on June 28, 2010. Even though DGR prevailed in its protest before the GAO, the Air Force has refused to pay DGR's attorneys' fees and costs of filing and pursuing the protest. AR 943.

The facts presented in this case are quite distinguishable from those in *Blue & Gold Fleet*, 492 F.3d at 1311–12. In that case, involving a National Park Service procurement of ferry services to San Francisco's Alcatraz Island, the protester complained that the agency improperly evaluated proposals because the solicitation did not include the wage and benefit requirements of the Service Contract Act, 41 U.S.C. §§ 351–358. The Federal Circuit agreed with the Court of Federal Claims' characterization that the protest was "a challenge to the terms of the solicitation," and held that the protest was untimely. 492 F.3d at 1313. The Federal Circuit ruled that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." *Id.*

In *Blue & Gold Fleet*, the protester had done nothing to challenge the omission of Service Contract Act requirements prior to the closing date for receipt of proposals. 492 F.3d at 1315. Instead, the protester waited until the Park Service had completed its evaluation of proposals. *Id.* After hearing that the Park Service had selected another offeror for award, only then did the protester take action. *Id.* The protester first filed a protest at the GAO, but upon learning of concerns about GAO's jurisdiction, the protester then filed suit at the Court of Federal Claims. *Id.* at 1311–12. All of these actions occurred at least six months after the closing date for receipt of proposals. *Id.*

In contrast, DGR challenged the Air Force's solicitation before the closing date for receipt of proposals, first with a letter to Air Force contracting officials, and then in a formal agency-level protest. DGR took these actions in compliance with the FAR, 48 C.F.R. § 33.103, adhering to the federal government's stated policy of attempting to resolve protests at the contracting officer and agency level. *Id.* § 33.103(b), (c). When these actions proved unsuccessful, DGR timely protested to the GAO within ten days of adverse agency action, 4 C.F.R. § 21.2(a)(3), and the GAO sustained DGR's protest. At each step, DGR followed applicable FAR and GAO protest procedures. DGR diligently pursued its solicitation challenge, quite unlike the protester in *Blue & Gold Fleet.*

The Federal Circuit's precise wording in *Blue & Gold Fleet* was that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process *waives its ability to raise the same objection subsequently in a bid protest action in the Court of Claims.*" 492 F.3d at 1313 (emphasis added). Contrary to the position of Defendant and Intervenor, this language does not suggest that a party challenging a solicitation error *must file suit in the Court of Federal Claims before the close of the bidding process.* All it says is that a party must have done something prior to the closing date to protest the solicitation error, before raising "the same

objection subsequently ... in the Court of Federal Claims." Following Defendant's and Intervenor's interpretation of *Blue & Gold Fleet* would have parties running into the Court of Federal Claims to challenge solicitation errors, instead of pursuing other available avenues of relief. Such an outcome would be directly at odds with government policy to seek resolution of protests within the agency.

■ The correct interpretation of *Blue & Gold Fleet* is that, if a party has challenged a solicitation impropriety before the close of the bidding process, the party is not precluded from later filing its protest at the Court of Federal Claims. A party must do something before the closing date to preserve its rights, and must thereafter pursue its position in a timely manner. In *Blue & Gold Fleet,* the protester did nothing, but in this case, DGR made the requisite challenge and prevailed at the GAO. The Court hardly can conceive of a greater injustice than to say to DGR "even though you followed applicable protest procedures and prevailed at the GAO, now you are out of luck because you failed to file a judicial action in the Court of Federal Claims before the close of the bidding process." Defendant's added insult to DGR would be that "the Air Force has decided not to follow the GAO's decision in your favor, and there is nothing you can do to prevent it."

Similarly, the Federal Circuit's decision in *Weeks Marine,* 575 F.3d at 1362–63, is not on point. There, the protester challenged a Corps of Engineers solicitation by filing suit in the Court of Federal Claims before the closing date for receipt of proposals. Defendant argued that the protester had not alleged any competitive injury, and therefore lacked standing to challenge the solicitation. *Id.* at 1358. On this issue, and because of *Blue & Gold Fleet,* the Federal Circuit ruled that the protester had the requisite standing:

> In light of *Blue & Gold Fleet,* were we to hold that Weeks cannot now challenge the MATOC solicitation in the Court of Federal Claims, we effectively would be saying that this court has set up a judicial scheme whereby a party runs afoul of the waiver rule if it waits to challenge a solicitation (as Blue & Gold Fleet did), but is properly

dismissed on standing grounds if it raises the challenge pre-award (as Weeks has done). Such a result would be anomalous. *Weeks Marine,* 575 F.3d at 1363. The Federal Circuit, quoting *WinStar Communications, Inc. v. United States,* 41 Fed.Cl. 748, 763 (1998), held that standing is met in a pre-award protest by showing "a non-trivial competitive injury which can be redressed by judicial relief." *Weeks Marine,* 575 F.3d at 1361. This case has no bearing in DGR's circumstances because Weeks filed suit before the closing date for receipt of proposals. *See id.* at 1356. The Federal Circuit's ruling that the Court of Federal Claims has protest jurisdiction when a party challenges a solicitation by filing suit before the close of the bidding process does not mean that this Court lacks jurisdiction in DGR's case.

Finally, the recent decision in *Esterhill Boat Service,* 91 Fed.Cl. at 487–88, is not authority for dismissing DGR's protest. In *Esterhill,* the procurement involved a Department of Veterans Affairs ("VA") building lease for a community-based outpatient clinic. The protester challenged a solicitation requirement that the leased space of 8,000 to 9,000 square feet must be located on one floor. *Id.* at 485. The protester, as the incumbent, could not satisfy the "one floor" requirement in its current space. *Id.* The protester submitted a letter to the contracting officer on July 10, 2009 protesting the "one floor" requirement before the close of the bidding process, but the VA proceeded to accept bids on July 31, 2009 as scheduled. *Id.* at 485 n. 4. The protester then filed a protest at the GAO on August 17, 2009, which the GAO dismissed as untimely because it was not received within ten days of adverse agency action. *Id.* Following the GAO's dismissal, the protester filed suit at the Court of Federal Claims.

The Court found Esterhill's judicial action to be untimely, because Esterhill waived its right to challenge the terms of the solicitation. In explaining the ruling, the Court observed:

> Esterhill raised concerns about the one-floor requirement both to the contracting officer and to the GAO. Mr. Waye [the contracting officer] confirmed that the re-

quirement was mandatory; the GAO declined jurisdiction. Thus, plaintiff made substantial efforts to obtain redress, particularly as compared to those of Blue & Gold. Esterhill apparently gambled on winning the contract anyway, which was entirely within its rights, but then sued when it lost the gamble. Once Esterhill learned that the VA considered the one-floor requirement mandatory, it should have filed suit in this court. Esterhill could have and should have protested immediately after its meeting with Mr. Waye.

*Esterhill*, 91 Fed.Cl. at 488.

The circumstances of Esterhill and DGR are materially different. Esterhill allowed its challenge to the "one floor" requirement to lapse after learning that the contracting officer considered this requirement to be mandatory. Esterhill took no further action until filing an untimely protest at the GAO. By that time, Esterhill was too late, and had waived its right to challenge the terms of the solicitation. In contrast, DGR at all times pressed ahead with its challenge to the Air Force's solicitation, and did not waive any of its rights. DGR's lawsuit was timely filed in the Court of Federal Claims, even though filed after the close of the bidding process.

The Court's finding of jurisdiction over DGR's protest is not inconsistent with *Blue & Gold Fleet, Weeks Marine,* or *Esterhill.* The analysis in each case is to determine whether the party filing suit at any time waived its right to challenge an error in the solicitation, either before the procuring agency, the GAO, or this Court. As discussed above, the plaintiff had waived its right in *Blue & Gold Fleet* and in *Esterhill,* but the plaintiff DGR has not. The *Weeks Marine* decision does not involve a waiver issue, and need not be considered for this purpose.

█ To be fair, dicta in *Esterhill* may have caused Defendant and Defendant–Intervenor to proffer their untenable argument for dismissal of DGR's suit. In commenting upon the Federal Circuit's decisions in *Blue & Gold Fleet* and *Weeks Marine,* the Court stated:

The appeals court could have allowed contractors to file agency-level protests to preserve their pre-award claims, or to object in a manner other than by filing suit in federal court. Instead, the court ruled that a contractor wishing to object to terms of a solicitation must file suit in the Court of Federal Claims before the bidding process ends, or not at all.

*Esterhill,* 91 Fed.Cl. at 487. This observation overstates the holding of *Blue & Gold Fleet* and *Weeks Marine.* The Federal Circuit has not thrown out the administrative process embodied in the FAR and GAO bid protest procedures, and has not held that protesters must rush into the Court of Federal Claims if they want to preserve their rights to challenge a solicitation error. Neither *Blue & Gold Fleet* nor *Weeks Marine* stands for this proposition. Rather, the proper inquiry is to assess whether a party has timely pursued an alleged defect in a solicitation as allowed by law, and whether the party has diligently pressed its position without waiver at each step of the way. The Court finds here that DGR has not waived its right to challenge the Air Force's solicitation. Therefore, Defendant's and Intervenor's motions to dismiss are denied.

B. *The Small Business Act Grants Priority to The HUBZone Program.*

█ The parties agree that this case hinges on a single question of statutory interpretation: whether the language of the Small Business Act grants priority to a HUBZone competition over a section 8(a) competition. The Court decided this same question earlier this year in *Mission Critical Solutions. See* 91 Fed.Cl. at 395. In that case, Chief Judge Hewitt found the language of the HUBZone provision to demand unequivocally the prioritization of the HUBZone program over other Small Business Act programs, including the section 8(a) program. The HUBZone provision makes clear that, before a procurement can be set-aside under the 8(a) program, a contracting officer must first determine if the procurement can be set-aside for a HUBZone small business concern. *See* 15 U.S.C. § 657a(b)(2)(B). In particular, the contracting officer must apply the "rule of two" and determine whether: (1) there is a reasonable expectation that two or more qualified HUBZone small business concerns

will submit offers; and (2) the award can be made at a fair market price. *See id.* Chief Judge Hewitt's analysis in *Mission Critical Solutions* is directly applicable here. *See* 91 Fed.Cl. at 395–412. The Court sees no need to modify the detailed, analytical and persuasive reasoning of the Chief Judge. A brief summary of the key underpinnings will suffice.

### 1. *The Chevron Method of Statutory Interpretation*

 *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), provides the framework for deciding the statutory interpretation question presented in this case. Under *Chevron*, this Court first must determine "whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 843, 104 S.Ct. 2778. "[I]f the statute is silent or ambiguous with respect to the specific issue," a court must proceed to the second step of *Chevron*, which is to ask whether the implementing agency's interpretation of the statute reasonable. *Id.; see also Ad Hoc Shrimp Trade Action Comm. v. United States*, 596 F.3d 1365, 1369 (Fed.Cir.2010). The court must not "impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation." *Chevron*, 467 U.S. at 843, 104 S.Ct. 2778. Rather, "*Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Nat'l Cable & Telecommunications Ass'n. v. Brand X Internet Servs.*, 545 U.S. 967, 980, 125 S.Ct. 2688, 162 L.Ed.2d 820 (2005). However, no deference to an agency's interpretation of the statute is due if Congress has made its intent "clear" in the statutory text. *See Chevron*, 467 U.S. at 842, 104 S.Ct. 2778.

 The Court's analysis thus begins with the language of the statute itself. *See Robinson v. Shell Oil Co.*, 519 U.S. 337, 340, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997). If, as here, the statute's language is unambiguous, the "'judicial inquiry is complete.'" *Conn. Nat.'l Bank*, 503 U.S. at 254, 112 S.Ct. 1146 (quoting *Rubin v. United States*, 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)); *Muwwakkil v. Office of Pers. Mgmt.*, 18 F.3d 921, 924 (Fed.Cir.1994) ("When statutory interpretation is at issue, the plain and unambiguous meaning of a statute prevails."); *Sharp v. United States*, 580 F.3d 1234,1238 (Fed.Cir.2009) ("Where the intent is unambiguously expressed by the plain meaning of the statutory text, we give effect to that clear language without rendering any portion of it meaningless."). To determine whether the statutory language is plain and unambiguous, the Court must look at "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Robinson*, 519 U.S. at 341, 117 S.Ct. 843. In the instant case, the relevant provisions of the Small Business Act are unambiguous, and Congress clearly has answered the question presented by the parties. Therefore, this Court finds no reason to afford deference under *Chevron* to the SBA's interpretation. *See Pub. Employees Ret. Sys. of Ohio v. Betts*, 492 U.S. 158, 171, 109 S.Ct. 2854, 106 L.Ed.2d 134 (1989) ("[N]o deference is due to agency interpretations at odds with the plain language of the statute itself.").

### 2. *The Plain Requirements of The HUBZone Program*

Here, Congress' intent to supersede *all* other laws and prioritize the HUBZone program over other Small Business Act programs is plain on the face of the statute. The HUBZone provision states that "[n]otwithstanding any other provision of law," 15 U.S.C. § 657a(b)(2):

> [A] contract opportunity *shall* be awarded pursuant to this section on the basis of competition restricted to qualified HUBZone small business concerns if the contracting officer has a reasonable expectation that not less than 2 qualified HUBZone small business concerns will submit offers and that the award can be made at a fair market price.

*Id.* § 657a(b)(2)(B) (emphasis added). In addition, a contract "*may* be awarded on a sole-source basis when those statutory conditions are not met." *Id.* § 657a(b)(2)(A) (emphasis added).

The operative language of the HUBZone provision thus combines the expansive phrase "notwithstanding any other provision of law" with the section providing that "a contract opportunity *shall* be awarded" under enumerated conditions. *See Shoshone Indian Tribe of Wind River Reservation v. United States,* 364 F.3d 1339, 1346 (Fed.Cir.2004) (emphasis added) (finding the operative language of the statute at issue to be "the combination of the phrases '[n]otwithstanding any other provision of law' and the directive that the statute of limitations 'shall not commence to run' on any claim until an accounting is provided"). Under the 8(a) program, a contracting officer also "shall award" on the basis of restricted competition if certain criteria are met.[5] *See* 15 U.S.C. § 637(a)(1)(D)(i). Yet, unlike its counterpart in the HUBZone provision, the mandatory language of the 8(a) restricted competition section is not preceded by the phrase "notwithstanding any other provision of law." *See id.* § 637(a)(1). It is the combination of the two phrases that creates a clear priority for the HUBZone program over the 8(a) program when the standards of the HUBZone program are satisfied. The Court will examine each of these phrases below.

a. *"Notwithstanding any other provision of law"*

The HUBZone provision prefaces its delegation of authority to the contracting officer with the phrase "[n]otwithstanding any other provision of law." *See* 15 U.S.C. § 657a(b)(2). Defendant argues that this phrase functions only to except awards made under the terms of the HUBZone program from the "full and open competition" that

would otherwise be required under 41 U.S.C. § 253a(a)(1)(A). (Def.'s July 9, 2010 Mot. 30.) Thus, according to Defendant, "this introductory phrase is reasonably understood to refer only to provisions outside of the Small Business Act that otherwise might frustrate the authority of a contracting officer to award a contract to a HUBZone concern." *Id.*

■ Defendant's interpretation is unsupported. First, under the rules of statutory construction, "notwithstanding any other provision of the law," must be given the meaning of its plain language. The Supreme Court has held that Congress includes a "notwithstanding" phrase to make clear its intent when one provision of a statute trumps another. *Cisneros v. Alpine Ridge Group,* 508 U.S. 10, 18, 113 S.Ct. 1898, 123 L.Ed.2d 572 (1993) (The "notwithstanding" phrase "clearly signals the drafter's intention that provisions of the 'notwithstanding' section override conflicting provisions of any other section.") (citing *Shomberg v. United States,* 348 U.S. 540, 547–48, 75 S.Ct. 509, 99 L.Ed. 624 (1955)). The Supreme Court noted that Courts of Appeals have "interpreted similar 'notwithstanding' language ... to supersede all other laws, stating that a clearer statement is difficult to imagine." *Id.* (quoting *Liberty Mar. Corp. v. United States,* 928 F.2d 413, 416 (D.C.Cir.1991) (internal quotations omitted)). In particular, the Federal Circuit affirmed a broad interpretation of the precise phrase "notwithstanding any other provision of law" found in the HUBZone provision. *See Shoshone Indian Tribe,* 364 F.3d at 1346. The Federal Circuit agreed that the "notwithstanding any other provision of the law" phrase "connotes a legislative intent to displace any other provision of law that is contrary" to the terms of the law introduced by the phrase. *See id.* Therefore, in the instant case, "any other provision of law" encompasses provisions found within

5. The 8(a) program specifically provides:
A contract opportunity offered for award pursuant to this subsection shall be awarded on the basis of competition restricted to eligible Program Participants if (I) there is a reasonable expectation that at least two eligible Program Participants will submit offers and that award can be made at a fair market price, and

(II) the anticipated award price of the contract (including options) will exceed $5,000,000 in the case of a contract opportunity assigned a standard industrial classification code for manufacturing and $3,000,000 (including options) in the case of all other contract opportunities. 15 U.S.C. § 637(a)(1)(D)(i).

the Small Business Act, including provisions implementing the 8(a) program. Because the "notwithstanding" clause applies to "any other provision of law" without relevant limitation, the effect is to give priority to the HUBZone provisions.

Second, the Court in *Mission Critical Solutions* examined the language of other provisions of the Small Business Act and found no language indicating that Congress intended to limit the plain meaning of this phrase. *See* 91 Fed.Cl. at 398. The Court here confirms Chief Judge Hewitt's assessment. It is true that the HUBZone provision does not contain an explicit priority over the 8(a) program. However, it is also true that nothing in the provision or more generally in the Act, restricts the application of the language "notwithstanding any other provision of law" to those provisions outside of the Act. Had Congress wanted to exclude other provisions of the Act from the application of the "notwithstanding any other provision of law" phrase, it could have done so. *See, e.g.,* 15 U.S.C. § 637(a)(21)(A) (Congress limited the scope of the "notwithstanding" phrase to the "preceding sentence" rather than "any other provision of law."). The Court cannot imply this limitation. *See Caminetti v. United States,* 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917) ("[T]he meaning of a statute must, in the first instance, be sought in the language in which the act is framed, and if that is plain, ... the sole function of the courts is to enforce it according to its terms."). Indeed, a comparison of the language of the HUBZone provision with the provision establishing the 8(a) program reveals that Congress' inclusion of "[n]otwithstanding any other provision of law" before its delegation of authority to the contracting officer was purposeful. *Compare* 15 U.S.C. § 657a(b)(2) *with* 15 U.S.C. § 637(a). Unlike the HUBZone provision, the 8(a) provision does not include the "notwithstanding" phrase or any language of similar effect before its restricted competition section setting forth award conditions. *See* § 637(a)(1)(C). "Notwithstanding any other provision of law" is a recurring phrase throughout the Small Business Act, including in the 8(a) provision. *See, e.g.,* §§ 637(b)(1)(D), (a)(21)(E). Congress' decision to omit the "notwithstanding"

phrase before the restricted competition section of the 8(a) provision, but to include it before a comparable section in the HUBZone provision, therefore is significant and meaningful.

Moreover, a literal interpretation of the phrase "notwithstanding any other provision of law" does not produce an "odd result" requiring the Court to look elsewhere for legislative intent. *See Pub. Citizen v. Dep't of Justice,* 491 U.S. 440, 454, 109 S.Ct. 2558, 105 L.Ed.2d 377 (1989) ("Where the literal reading of a statutory term would compel an odd result, ... we must search for other evidence of congressional intent to lend the term its proper scope.") (internal quotation omitted). In *Mission Critical Solutions,* Chief Judge Hewitt correctly observed that the inclusion of the phrase "notwithstanding any other provision of law" in the HUBZone provision does not place the HUBZone program in conflict with the 8(a) program. 91 Fed.Cl. at 402. A contracting officer retains the discretion to place contracts in the 8(a) program whenever the HUBZone statutory criteria are not satisfied. *See* 15 U.S.C. §§ 637(a), 657a(b)(2)(B). Therefore, the "notwithstanding" phrase indicates only that the HUBZone program has a priority, but does not preempt the 8(a) program.

Accordingly, the Court again rejects Defendant's interpretation of the phrase "notwithstanding any other provision of the law." *See Mission Critical Solutions,* 91 Fed.Cl. at 402. The Court will not give a meaning to this phrase more narrow than the plain language indicates.

b. *"[A] contract opportunity shall be awarded"*

The HUBZone provision of the Small Business Act requires that "a contract opportunity *shall be awarded* pursuant to [section 657a] on the basis of competition restricted to qualified HUBZone small business concerns" if the rule of two is met. 15 U.S.C. § 657a(b)(2)(B) (emphasis added). Relying upon this Court's earlier decision in *Mission Critical Solutions,* DGR argues that the language "shall be awarded" mandates a set-aside for HUBZone small business concerns

over other small business programs whenever the rule of two is met. The GAO reached a similar interpretation of this language in *DGR Associates,* B–402494, 2010 CPD ¶ 115 (Comp.Gen. May 14, 2010) (finding that the plain language of the statute required the Air Force first to consider whether the conditions for setting aside a procurement for HUBZone businesses were met, and if so, to set aside the procurement for HUBZone small businesses).

 The word "shall" is considered the "language of command" and is presumptively mandatory. *See Anderson v. Yungkau,* 329 U.S. 482, 485, 67 S.Ct. 428, 91 L.Ed. 436 (1947). In contrast, "[t]he word 'may,' when used in a statute, usually implies some degree of discretion." *See United States v. Rodgers,* 461 U.S. 677, 706, 103 S.Ct. 2132, 76 L.Ed.2d 236 (1983). As in *Mission Critical Solutions,* the Court interprets the language of the HUBZone competition provision ("shall be awarded") to be mandatory. 91 Fed.Cl. at 403–04. The Court agrees with Defendant that the mandatory language of the competition provision contrasts with the permissive language ("may") in the HUBZone's sole-source provision. The Court, however, finds that the HUBZone competition subsection should be interpreted both in relation to other subsections within the HUBZone provision, such as the sole-source section, *and* in relation to other sections of the Small Business Act, including the section establishing the 8(a) program. Again, there is no language in either the HUBZone provision, or the Small Business Act more generally, to restrict the application of the mandatory language of the HUBZone competition subsection to the HUBZone program alone. Moreover, the competition phrase "shall be awarded" is prefaced by the expansive phrase "notwithstanding any other provision of law," which this Court has interpreted to apply to other provisions in the Small Business Act. In combination, the phrases "not-withstanding any other provision of law" and "shall be awarded" leave no doubt that a contract is to be awarded under the HUBZone program's restricted competition subsection if the required conditions are met.[6] Only after the contracting officer has determined that these conditions are not satisfied, can the procurement be awarded as a HUBZone sole source contract or set-aside under another small business program.

### 3. *Legislative History Presents no Clear Contrary Intent to Plain Meaning Interpretation.*

 Although the Court finds the plain language of the HUBZone provision to establish the priority of the HUBZone program over the 8(a) program, the Court will examine the legislative history "only to determine whether a clear intent contrary to the plain meaning exists." *Sharp,* 580 F.3d at 1238 (quoting *Glaxo Operations UK Ltd. v. Quigg,* 894 F.2d 392, 396 (Fed.Cir.1990)). In "rare and exceptional circumstances," the presumption that the plain language of the statute expresses congressional intent can be rebutted. *United States v. James,* 478 U.S. 597, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986) (quoting *Rubin v. United States,* 449 U.S. 424, 430, 101 S.Ct. 698, 66 L.Ed.2d 633 (1981)). Seldom is the legislative history clear enough to overcome the strong presumption " 'that the legislative purpose is expressed by the ordinary meaning of the words used.' " *American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 71 L.Ed.2d 748 (1982) (quoting *Richards v. United States,* 369 U.S. 1, 9, 82 S.Ct. 585, 7 L.Ed.2d 492 (1962)); *see, e.g., Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 64 L.Ed.2d 766 (1980) ("[O]rdinarily even the contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history."); *James,* 478 U.S. at 606, 106 S.Ct. 3116 (finding legislative history did not merit a departure from the plain

---

**6.** As Defendant points out, the phrase "notwithstanding any other provision of law" precedes subsections (A), (B), and (C), and not simply the restricted competition provision set forth in subsection (B). However, this fact does not change the Court's interpretation. Subsections (A) and (C) contain permissive language. Only subsection (B) contains the mandatory word "shall," which serves to indicate the priority of this subsection over the others and when combined with the phrase "notwithstanding any other provision of law" establishes the priority of the HUBZone competition provision over other provisions in the Small Business Act.

language of the statute). "Going behind the plain language of a statute in search of a possibly contrary congressional intent is 'a step to be taken cautiously' even under the best of circumstances." *American Tobacco Co.*, 456 U.S. at 75, 102 S.Ct. 1534 (quoting *Piper v. Chris–Craft Indus., Inc.*, 430 U.S. 1, 26, 97 S.Ct. 926, 51 L.Ed.2d 124 (1977)).

■ Defendant argues as it did in *Mission Critical Solutions* that legislative history clearly indicates Congress' intent not to prioritize the HUBZone Program over other small business programs, including the 8(a) program. *See* Def.'s July 20, 2010 Reply 15–16; *see also* 91 Fed.Cl. at 407. To overcome the plain meaning of the statute, Defendant must establish that the legislative history embodies "an 'extraordinary showing of contrary intention.'" *Glaxo Operations*, 894 F.2d at 396 (quoting *Garcia v. United States*, 469 U.S. 70, 75, 105 S.Ct. 479, 83 L.Ed.2d 472 (1984)). Defendant has not satisfied this burden.

To support its argument, Defendant relies heavily on the Senate version of the HUBZone program, introduced in 1997 as part of the Small Business Reauthorization Act. (Def.'s July 9, 2010 Mot. 34.) Defendant alleges that because the original Senate version of the Small Business Reauthorization Act contained language clarifying that the HUBZone assistance provisions "shall not limit the discretion of a contracting officer to let any procurement contract to [SBA] under section 8(a)," the intent of Congress was to establish parity between the 8(a) and HUBZone programs. *Id.; see also* S. 1139, 105th Cong. § 31(b)(5) (as reported by S. Comm. on Small Business, Aug. 19, 1997, S.Rep. No. 105–62). A Senate Committee Report explained that the HUBZone program was "not designed to compete with SBA's 8(a) Program," and an agency's contracting officer had "the flexibility to decide whether to target a specific procurement requirement for the HUBZone Program or the 8(a) Program." S.Rep. No. 105–62, at 26 (1997). However, as Defendant acknowledges, the parity provision was dropped from the proposed bill during the reconciliation process with no explanation. *See* 143 Cong. Rec. 24,206 (1997). Defendant also cites

Representative John J. LaFalce expressions of concern that the HUBZone program could impact negatively the 8(a) program. (Def.'s July 9, 2010 Mot. 35.) Representative LaFalce, however, does not state explicitly that Congress wished the programs to be in parity with one another. *See* 143 Cong. Rec. 25,760 (1997).

Defendant further accuses the Court in *Mission Critical Solutions* of ignoring this "extensive" legislative history. *Id.* at 36 (citing *Mission Critical Solutions*, 91 Fed. Cl at 408). Chief Judge Hewitt in fact did consider at length the legislative history behind the HUBZone provision. *See* 91 Fed.Cl. at 406–10 ("Nor is the court persuaded to ignore the plain meaning of the statutory language by the legislative history that defendant cites."). The Court concluded that without a clear legislative intent, the plain meaning of the HUBZone statute must prevail. *See id.* at 409–10.

The Court again finds the legislative history Defendant cites to be unpersuasive and certainly insufficient to overcome the unambiguous language of the HUBZone provision. Specifically, the Court agrees with Chief Judge Hewitt in *Mission Critical Solutions* that: "With no explanation from the Senate as to why the parity provision was omitted, the fact that it was omitted is inconclusive." *Id.* at 408. Any conclusions regarding Congress' reasons for removing all parity language from the HUBZone provision are purely speculative. Speculation is surely not an "extraordinary showing of contrary intention" justifying a departure from the plain meaning of the HUBZone provision. *Glaxo Operations*, 894 F.2d at 396 (internal quotations omitted). Moreover, the comments that Defendant cites from a single House of Representatives member offer at most evidence of the intent of that one member, not of the entire Congress. *See Barnhart v. Sigmon Coal, Co., Inc.*, 534 U.S. 438, 457, 122 S.Ct. 941, 151 L.Ed.2d 908 (2002) ("Floor statements from two Senators cannot amend the clear and unambiguous language of a statute."); *see also Mission Critical Solutions*, 91 Fed.Cl. at 408.

Therefore, the Court's inquiry into Congress' intent must begin and end with the

language of the HUBZone program, what it does say and what it does not say. *See Conn. Nat'l Bank,* 503 U.S. at 254, 112 S.Ct. 1146. Despite Defendant's contentions, this Court does not find that the legislative history of the statute warrants departure from the plain words of the Small Business Act.

#### C. *The Air Force Violates The Small Business Act by Complying With The SBA's Statutory Interpretation.*

■ If the Air Force had followed the HUBZone provision as it was obligated to do by the plain statutory language, it would have found there was a reasonable expectation that at least two qualified HUBZone small business concerns could submit offers at fair market prices. Under an earlier solicitation for the same services, Solicitation I, four offerors submitted proposals under a HUBZone small business set-aside, including DGR. After awarding Solicitation I under the HUBZone program, the Air Force cancelled it following DGR's protest of the contract award to an ineligible entity. Therefore, if the Air Force had complied with the Small Business Act as interpreted herein, the current contract would have been set aside for a HUBZone small business concern, which would have given DGR an opportunity to compete.

#### D. *Permanent Injunctive Relief is Granted.*

■ On June 28, 2010, when DGR filed its lawsuit, DGR requested declaratory and injunctive relief to prohibit the Air Force from proceeding with the performance of the contract awarded to General Trades & Services for military family housing maintenance services. The Court has substantial discretion to decide whether to grant injunctive relief in a bid protest. *See* 28 U.S.C. § 1491(b)(2) ("To afford relief in such an action, the courts may award any relief that the court considers proper, including declaratory and injunctive relief except that any monetary relief shall be limited to bid preparation and proposal costs."); *see also PGBA v. United States,* 389 F.3d 1219, 1223–24 (Fed.Cir.2004) ("We give deference to the Court of Federal Claims' decision to grant or

deny injunctive relief . . . .") (citation omitted). In determining whether to grant injunctive relief, a court considers:

> (1) whether, as it must, the plaintiff has succeeded on the merits of the case; (2) whether the plaintiff will suffer irreparable harm if the court withholds injunctive relief; (3) whether the balance of hardships to the respective parties favors the grant of injunctive relief; and (4) whether it is in the public interest to grant injunctive relief.

*Id.* at 1228–29 (citing *Amoco Prod. Co. v. Vill. of Gambell, Alaska,* 480 U.S. 531, 546 n. 12, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987)).

DGR succeeded on the merits in this case and thus, has satisfied the first criterion of the four-part injunctive relief test. The Court already concluded in *Mission Critical Solutions* that "the mandatory language of the HUBZone statute requires that a contracting officer first determine whether the specified criteria are met before awarding a contract under another small business program or on a sole-source basis." 91 Fed.Cl. at 411. The Court here agrees with Chief Judge Hewitt's determination. Accordingly, the Air Force violated the Small Business Act by complying with the SBA's regulations, which fail to prioritize the HUBZone program over other small business programs as provided in the plain language of the Act. *See* 15 U.S.C. § 657a(b)(2)(B). If the Air Force had followed the HUBZone provision as it was obligated to do by the plain statutory language, it would have found there was a reasonable expectation that at least two qualified HUBZone small business concerns could submit offers at fair market prices. DGR would have been given an opportunity to compete.

■ DGR also must satisfy the remaining requirements—irreparable harm, balance of the hardships, and public interest—for a permanent injunction to issue. DGR asserts that, because the Air Force refused to follow the law in issuing Solicitation II, it was unable to compete for a procurement that as the incumbent contractor it had a reasonable chance of winning and thus, it lost potential profits. (Pl.'s TRO Mem. 16.) A lost opportunity to compete for a

contract is sufficient to demonstrate irreparable harm. *See Magnum Opus Techs. v. United States,* 94 Fed.Cl. 512, 544, 2010 WL 2255523, at \*27 (Fed.Cl.2010) (finding that being deprived of the chance to compete for a procurement constitutes irreparable harm); *Overstreet Elec. Co., Inc. v. United States,* 47 Fed.Cl. 728, 744 (2000) ("[A] lost opportunity to compete in a fair competitive bidding process for a contract, has been found sufficient to prove irreparable harm."). Accordingly, DGR has established that it will suffer irreparable harm in the absence of injunctive relief.

Next, the Court must consider whether the balance of hardships to the respective parties weighs in favor of awarding injunctive relief. As mentioned above, without injunctive relief, DGR will be denied the potential benefit of winning the competition and retaining the contract. An injunction also could result in additional procurement costs and further delay in the performance of the contract. However, because the Air Force's second solicitation was not conducted in accordance with applicable law, the additional time and effort required to conduct the procurement in a lawful manner fails to constitute an adequate hardship. Thus, the balance of hardships tilts in DGR's favor.

Finally, the Court looks to whether the public interest would be served by the granting of injunctive relief. "There is an overriding public interest in preserving the integrity of the procurement process by requiring the government to follow its procurement regulations." *Hosp. Klean of Tex., Inc. v. United States,* 65 Fed.Cl. 618, 624 (2005). The public interest obviously is served by ensuring that contracting agencies follow applicable procurement statutes and regulations. *See, e.g., Magnum Opus Techs.,* 94 Fed.Cl. at 550–51, 2010 WL 2255523, at \*34 (citing *Heritage of Am., LLC v. United States,* 77 Fed.Cl. 66, 80 (2007); *Hunt Bldg. Co., Ltd. v. United States,* 61 Fed.Cl. 243, 280 (2004); *Cincom Sys., Inc. v. United States,* 37 Fed.Cl. 266, 269 (1997)). In this case, because the Air Force acted in violation of the law when it issued the second solicitation under the 8(a) program, it is in the public interest for the Court to correct the illegality

that occurred and stop the contract from proceeding. The illegal contract must be cancelled and a new solicitation issued. DGR does not automatically become the contract awardee, but DGR will be able to compete for the award. This final factor thus also favors DGR.

*Conclusion*

By this decision, the Court enters a permanent injunction requiring the Air Force and the Small Business Administration to terminate the unlawful contract awarded to General Trades & Services, and to determine whether the criteria of 15 U.S.C. § 657a(b)(2)(B) are met, such that the contracting opportunity at issue must be set aside and awarded on the basis of restricted competition to a qualified HUBZone small business concern. Defendant is enjoined from awarding the contract in a manner that is inconsistent with this decision. This permanent injunction shall take effect upon the filing of this Opinion and Order in the Court's electronic filing system.

The Court GRANTS DGR's motion for judgment on the administrative record and DENIES Defendant's and Defendant–Intervenor's cross-motions for judgment on the administrative record. Defendant's and Defendant–Intervenor's motions to dismiss also are DENIED. The Court directs the Clerk to enter judgment in favor of Plaintiff.

IT IS SO ORDERED.