# In the United States Court of Federal Claims

No. 12-694 C

(Filed June 5, 2013)[1]

```
* * * * * * * * * * * * * * * * *    *
ADVANCED AMERICAN               *
CONSTRUCTION, INC.,             *   Pre-Award Bid Protest;
                                *   Post-Award Bid Protest;
            Plaintiff,          *   Standing; Blue & Gold Fleet;
                                *   Documented Market Research;
       v.                       *   8(a) Business Development
                                *   Program; FAR 10.001;
THE UNITED STATES,              *   FAR 10.002; FAR 19.805-1;
                                *   Special Standards of
            Defendant.          *   Responsibility.
                                *
* * * * * * * * * * * * * * * * *    *
```

*Joseph A. Yazbeck, Jr.*, with whom was *D. Brent Carpenter*, Portland, OR, for plaintiff.

*David A. Levitt*, United States Department of Justice, with whom were *Stuart F. Delery*, Principal Deputy Assistant Attorney General, *Jeanne E. Davidson*, Director, *Claudia Burke*, Assistant Director, Washington, DC, for defendant. *Tyler Moore* and *Thomas J. Warren*, United States Army Corps of Engineers, of counsel.

_____

## OPINION AND ORDER

_____

[1] This opinion was issued under seal on May 10, 2013. Pursuant to ¶ 4 of the ordering language, the parties were invited to identify source selection, proprietary, or other confidential material subject to deletion on the basis that the material was either protected or privileged. On May 24, 2013, the parties filed a notice indicating that they had no proposed redactions to the opinion. Thus, with the exception of this footnote and the publication date, the public and sealed versions of this opinion are identical.

**Bush**, *Judge*.

Advanced American Construction, Inc. (AAC) filed its pre- and post-award bid protest complaint in this court on October 15, 2012. In its complaint, AAC challenges the decision of the United States Army Corps of Engineers (the Corps or agency) to set aside a contract under Solicitation No. W912EF-12-B-0022 (the IFB) for competition among 8(a) small business concerns. AAC also challenges the award of that contract to TSS-Garco Joint Venture (TSS-Garco). The subject contract is for the construction of a new barge moorage facility on the north side of the Snake River at Lower Granite Dam near Pomeroy, Washington. Defendant has agreed to stay performance of the contract until the court resolves this protest on the merits.[2]

This bid protest is now before the court on defendant's motion to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), and on the parties' cross-motions for judgment on the administrative record pursuant to RCFC 52.1. Because plaintiff has standing in this case and did not waive its pre-award challenges to the IFB, the court hereby denies defendant's motion to dismiss the complaint. For the reasons discussed below, however, the motion for judgment on the administrative record filed by defendant is granted, and the cross-motion filed by plaintiff is denied.

## BACKGROUND

### I.     Factual Background

On July 30, 2012, the Walla Walla District of the Corps issued the IFB. *See* AR Tab 13. Because most of AAC's challenges to the procurement are based on the agency's decision to offer the contract to the Small Business Administration (SBA) as an 8(a) set-aside, the court's recitation of the facts in this case are focused primarily on events that occurred before the IFB was issued by the Corps.

---

[2]/ *See* AR at 3110 (continuing the suspension of performance that had been triggered by AAC's earlier protests to GAO). The IFB states that all in-water work under the contract was to be completed between December 15, 2012, and February 28, 2013. *Id.* at 168. In continuing the suspension of performance, the contracting officer explained that the time lost during the earlier GAO bid protest "create[d] a high risk of not completing this project within the in-water work window required by the contract." *Id.* at 3110.

### A.      The 8(a) Business Development Program

In 1978, Congress amended the Small Business Act to establish the 8(a) business development program.  Pub. L. No. 95-507, sec. 202, 92 Stat. 1757, 1761 (1978) (codified as amended at 15 U.S.C. § 637 (2006)).  Under that program, a procuring agency may offer a contract to the SBA as a prime contractor, which then subcontracts the requirements of that contract to small business concerns owned and controlled by socially and economically disadvantaged individuals, otherwise known as 8(a) firms.[3]  *See* 15 U.S.C. § 637(a)(1)(A)-(B).  Generally, set-aside contracts with a value below the competitive acquisition threshold – currently, $4 million for construction contracts – are awarded on a sole-source basis, while contracts with a value above that threshold are competed among 8(a) firms.  *See id.* § 637(a)(1)(D)(i); 13 C.F.R. § 124.506 (2013); 48 C.F.R. § 19.805-1 (2012).

Under the Small Business Act, the president is required to establish goals for the percentage of procurement contracts awarded to various types of small business concerns in each year.  15 U.S.C. § 644(g)(1) (2006).  For the 8(a) program, the Act provides that the government-wide goal must be at least five percent of the total value of all prime contract and subcontract awards in each fiscal year.  *Id.*  Individual agencies are also required to establish their own contracting goals, which are to represent "the maximum practicable opportunity for small business concerns, small business concerns owned and controlled by service-disabled veterans [SDVOSBs], qualified HUBZone small business concerns, small business concerns owned and controlled by socially and economically disadvantaged individuals, and small business concerns owned and controlled by women."  *Id.*

The SBA and the Department of Defense, of which the Corps is a part, have entered into a partnership agreement, under which the Corps is authorized to award

---

[3]/  The Small Business Act defines socially disadvantaged individuals as "those who have been subjected to racial or ethnic prejudice or cultural bias because of their identity as a member of a group without regard to their individual qualities," 15 U.S.C. § 637(a)(5), while economically disadvantaged individuals are those socially disadvantaged individuals "whose ability to compete in the free enterprise system has been impaired due to diminished capital and credit opportunities as compared to others in the same business area who are not socially disadvantaged," *id.* § 637(a)(6)(a).

contracts to the 8(a) firms directly.  *See* AR at 1081-91.  Section 19.803 of the Federal Acquisition Regulation (FAR) describes the process for selecting acquisitions for the 8(a) program:

> Through their cooperative efforts, the SBA and an agency match the agency's requirements with the capabilities of 8(a) concerns to establish a basis for the agency to contract with the SBA under the program. Selection is initiated in one of three ways —
>
> (a)    The SBA advises an agency contracting activity through a search letter of an 8(a) firm's capabilities and asks the agency to identify acquisitions to support the firm's business plans.
>
> . . . .
>
> (b)    The SBA identifies a specific requirement for a particular 8(a) firm or firms and asks the agency contracting activity to offer the acquisition to the 8(a) Program for the firm(s).
>
> . . . .
>
> (c)    Agencies may also review other proposed acquisitions for the purpose of identifying requirements which may be offered to the SBA.  Where agencies independently, or through the self-marketing efforts of an 8(a) firm, identify a requirement for the 8(a) Program, they may offer on behalf of a specific 8(a) firm, for the 8(a) Program in general, or for 8(a) competition.

48 C.F.R. § 19.803 (2012).  Following a preliminary evaluation of its decision to offer an acquisition to the SBA for inclusion in the 8(a) program, *see* 48 C.F.R. § 19.804-1 (2012), the agency then formally offers the acquisition to the SBA, and it is required to include certain information about the project in its letter to the SBA, *see* 48 C.F.R. § 19.804-2 (2012).  Finally, the SBA must accept – or decline

4

– the acquisition for inclusion in the 8(a) program within a specified period of time. *See* 48 C.F.R. § 19.804-3 (2012).

## B. The Challenged Procurement

### 1. The Set-Aside Decision

Based on the record, it appears that the decision to set aside the subject contract for competition among 8(a) firms began to take shape in April 2012. Initially, Scott Beckstrand, the small business programs manager for the Walla Walla District of the Corps, planned to set aside the project for SDVOSBs. AR at 860. Following a veterans' business conference in April 2012, however, Mr. Beckstrand determined that there would not be sufficient competition among SDVOSBs to ensure price reasonableness. *Id.* For that reason, Mr. Beckstrand elected to pursue an 8(a) small business set-aside. *Id.*

On or about May 14, 2012, the contracting officer for this procurement e-mailed the statement of work for the proposed project to Mr. Beckstrand, who was then attending a conference with representatives from the SBA. AR at 940. During outreach meetings and in his office, Mr. Beckstrand met with no fewer than eighteen 8(a) firms and other small businesses to discuss their ability to perform complex marine construction projects. *Id.* at 860-61.

On May 29, 2012, Mr. Beckstrand e-mailed the Seattle and Boise offices of the SBA to discuss the feasibility of setting aside the proposed procurement for competition among 8(a) firms located in Washington and Idaho. *See* AR Tabs 2-3. In that e-mail message, Mr. Beckstrand explained that the project would involve the construction of a new barge mooring facility on the Upper Snake River, with a total value of approximately $8 million. *Id.* at 6, 8. Mr. Beckstrand also noted that "[p]reliminary market research indicates competent and qualified contractors in this area." *Id.*

On the same day, Diana Drake of the SBA's office in Seattle responded to Mr. Beckstrand's message, requesting the North American Industry Classification System (NAICS) code for the project. AR at 5. Mr. Beckstrand responded that the assigned code for the construction project was 237990, *id.*, which corresponds to "Other Heavy and Civil Engineering Construction," and includes, *inter alia*,

"[c]onstruction projects involving water resources (e.g., dredging and land drainage), [and] development of marine facilities." Def.'s Mot. at 6 n.4. Ms. Drake replied that there were at least ten 8(a) firms based in Washington that would be able to bond the required amount for the project. AR at 5. On June 6, 2012, Irene Gonzalez of the SBA's office in Boise informed Mr. Beckstrand that there were three 8(a) firms in Idaho that would be able to meet the bonding requirement for the project, based on its NAICS code. *Id.* at 7.

For any procurement that has a total value exceeding $150,000, the agency's acquisition strategy must be approved by the Tactical Acquisition Strategy Board (TASB). *See* Def.'s Mot. at 7-8. On June 18, 2012, the contracting officer signed off on the decision to set the project aside for competition restricted to 8(a) firms. AR at 9-11. The signed document was then forwarded to the members of the TASB for review. *Id.* One member of the TASB suggested that the requirements be procured through an open and unrestricted competition in order to ensure competitive bids. *Id.* at 14-15. However, Ruthann Haider, the chief of contracting for the agency, dismissed that concern, noting that the Corps had identified seven 8(a) firms that were qualified, in addition to the ten 8(a) firms the SBA's Seattle office predicted would bid on the contract.[4] *Id.* at 14. In response to Ms. Haider's e-mail, a second member of the TASB surmised that an 8(a) set-aside could increase the agency's costs by twenty percent or more, *id.*, and recommended that the agency's requirements be procured through an unrestricted competition instead of an 8(a) set-aside, *id.* at 13. Mr. Beckstrand then sent an e-mail to the TASB members on June 21, 2012, which listed the names of the thirteen 8(a) firms identified by the SBA. *Id.* at 857-59.

It appears that Mr. Beckstrand's e-mail failed to completely allay the TASB's concerns. Thus, in a subsequent e-mail sent on July 9, 2012, Mr. Beckstrand asked Kevin Michael, the procurement center representative for Area VI at the SBA, whether he would be willing to agree to an unrestricted competition for the barge mooring project. AR at 118-19. Mr. Michael responded as follows:

---

[4] It is not clear whether any of the seven qualified 8(a) firms identified by the Corps through its market research were included within the group of ten 8(a) firms identified by the SBA's Seattle office. *See* AR at 14 ("We did Market Research and found at least 7 8(a)s qualified to do this work – in addition the SBA 8(a) coordinator has 10 8(a)s that have said they will bid this IFB.").

You are joking right? $8M contract with sufficient 8(a) contractors, first I have heard about this, I get it sent to me 11:11 a.m. today and you guys want a decision today. I am supposed to sign off on the project as unrestricted because the PM is "nervous". This would be begging for a protest. Even assuming I might consider this, [t]he 8(a) people need to sign off on this action. Diana Drake is out of the office, and I am waiting to hear from Ms. Gonzalez.

*Id.* 118.

It is not clear from the record whether there was any further communication between Mr. Beckstrand and Mr. Michael regarding an unrestricted competition for the barge moorage project. The next day, however, the Corps sent letters to both the Seattle and Boise offices of the SBA, offering the project as a set-aside for competition restricted to 8(a) firms. *See* AR Tabs 7-8. The Corps attached an information sheet for the construction project to each of the offer letters, which described the scope, nature, value, and duration of the work to be performed. *See id.* at 125-27. The offer letter listed the names of the thirteen 8(a) firms that had been identified by the Seattle and Boise offices of the SBA, and emphasized that a "[f]loating plant, drill rig, and diving are required for performance of the work." *Id.* at 125.

In a letter dated July 18, 2012, the Seattle office of the SBA accepted the barge mooring project into the 8(a) business development program.[5] AR Tab 11. The acceptance letter authorized the Corps to issue a solicitation for the project, and it specified that the competition was to be limited to 8(a) firms located within Washington and Idaho. *Id.* at 135. The letter also stated that the SBA's "analysis indicates that acceptance of this requirement meets the criteria for competition in the 8(a) [Business Development] Program." *Id.* Finally, the letter indicated that the "SBA will confirm the eligibility of the apparent successful offeror to receive the contract award and will notify your office, in writing, of its determination." *Id.* at 136.

---

[5] The Seattle office accepted the offer from the Corps because the construction project was to be completed in Washington. *See* 13 C.F.R. § 124.502(b)(2) (2012).

## 2. The IFB

The Corps published a synopsis of the procurement on the Federal Business Opportunities online publication (FedBizOpps) on July 18, 2012. *See* AR Tab 12. The synopsis on FedBizOpps described the construction project as follows:

> This project involves construction of a new moorage facility and mooring dolphin at Lower Granite Dam in Whitman County, Washington.
>
> The new moorage facility will be a reinforced concrete wharf approximately 300 feet in length and 40 feet in width. The wharf will be fabricated using a combination of cast-in-place and precast concrete. The wharf structure will consist of precast cap beams and precast slabs set on top of 4.5-foot diameter reinforced concrete drilled shafts, approximately 40-feet in length. A cast-in-place topping slab and in-fill will tie the drilled shafts, cap beams, and precast slabs together. At least one floating plant and drill rig will be required for installation of the drilled shafts.
>
> The mooring dolphin will consist of a 15-foot diameter concrete shaft, approximately 40 feet in length, drilled and anchored approximately 20 feet into bedrock. The mooring dolphin will have a permanent steel casing, mooring cleats, fender system, and a cast-in-place top slab.
>
> Other work includes excavation, trenching for utilities, asphalt repair, installation of fender systems, mooring cleats, mooring bits, potable water lines, compressed air lines, electrical receptacles, area lighting, traffic bollards, and fabrication of a movable access stairway.

AR at 138. The synopsis also stated that the contract would be awarded as a competitive 8(a) set-aside with an NAICS code of 237990. *Id.* at 137. Finally, the

synopsis noted that the Corps intended to issue the IFB on or about July 30, 2012, and that bids would be due on August 29, 2012. *Id.* at 139. On July 19, 2012, the synopsis was amended to state that only 8(a) firms located within the geographic areas of Washington or Idaho, or 8(a) firms with a bona fide place of business in that area and assigned the appropriate NAICS code, would be eligible for award.[6] *Id.* at 142.

On July 30, 2012, the Corps issued the IFB, which contemplated the award of a firm fixed-price (FFP) contract. *See* AR Tab 13. The IFB specified that only 8(a) firms located in Washington and Idaho were eligible for award, and instructed offerors to submit their bids no later than 2:00 p.m. on August 30, 2012. *Id.* at 145. The IFB further stated that sealed bids would be publicly opened at that time. *Id.* In an amendment to the IFB, the opening date for bids, and the deadline for the submission of bids, were extended to 3:00 p.m. on August 30, 2012.[7] *Id.* at 835.

Finally, the IFB states that

> [t]his contract is issued as a direct award between the contracting office and the 8(a) Contractor pursuant to the Partnership Agreement between the [SBA] and the Department of Defense. Accordingly, the SBA, even if not identified in Section A of this contract, is the prime contractor and retains responsibility for 8(a) certification, for 8(a) eligibility determinations and related issues, and for providing counseling and assistance to the 8(a) Contractor under the 8(a) Program.

AR at 174.

---

[6] The original synopsis also stated that the procurement would be set aside for eligible 8(a) firms in Washington and Idaho. AR at 138.

[7] There were four amendments to the IFB, *see* AR Tabs 16-19, but, with the exception of the extension of the deadline for bids, none of those amendments is relevant in this case.

### 3. Contract Award to TSS-Garco

A total of six firms submitted bids in response to the IFB. *See* AR Tab 14. Five of the offerors were certified 8(a) firms, and one – plaintiff AAC – was not. TSS-Garco, a joint venture formed in 2012 for the sole purpose of submitting a bid on the barge moorage project, submitted the lowest bid of $6,969,000. *Id.* at 686. Plaintiff submitted the second-lowest bid, in the total amount of $7,345,000. *Id.* The government estimate for the project was $9,122,599, *id.* at 890-92, and the highest bid received was $9,470,000, *id.* at 686.

On September 14, 2012, the Corps conducted a pre-award survey for the contract and determined that TSS-Garco was a responsible bidder and eligible for award. *See* AR Tab 27; *see also id.* at 1156 (confirming that TSS-Garco was an approved joint venture within the 8(a) program). On September 19, 2012, the Corps notified TSS-Garco that it was the successful bidder on the procurement. *See id.* Tab 30. The contract was executed the same day, *see id.* at 1162, and plaintiff was notified of the contract award in a letter dated September 19, 2012, *see id.* at 1707.

## II. Procedural History

### A. Agency-Level Protests

On August 7, 2012, after the IFB had been issued but before the deadline for the submission of bids, plaintiff filed an agency-level protest with the Corps. *See* AR at 961-91. Plaintiff filed supplemental protests on August 20, 2012, *see id.* at 993-96, and on August 24, 2012, *see id.* at 998-1012. In its agency-level protests, plaintiff argued that the IFB required that the 8(a) firm selected for contract award, rather than its subcontractors or joint venturer, be "regularly engaged" in the specialized work of marine construction, and that no 8(a) firm could meet that requirement. Plaintiff also asserted that, under FAR 19.805-1, the Corps was required to have a reasonable expectation, before offering the project to the SBA, that at least two eligible and responsible 8(a) firms would submit bids on the project. Finally, plaintiff argued that the agency failed to conduct the necessary market research required by FAR 10.001. On September 19, 2012, the same day that the Corps awarded the contract to TSS-Garco, the Northwest Division Office of the Corps denied the protests. *See* AR Tab 33.

**B.      GAO Protests**

Following the award of the contract to TSS-Garco, plaintiff filed a protest with the Government Accountability Office (GAO) on September 21, 2012, *see* AR Tab 34, and it filed a supplemental protest with GAO on September 24, 2012, *see* AR Tab 35.  In its protests before GAO, plaintiff raised the same arguments it presented to the agency, which are essentially the same arguments now before this court.  GAO summarily dismissed the protest as untimely on October 11, 2012. *See* AR Tab 42.

**C.      Proceedings in this Court**

Plaintiff filed its bid protest complaint in this court on October 15, 2012. With its complaint, plaintiff also filed a motion for a preliminary injunction, as well as a memorandum in support of that motion.  TSS-Garco has not moved to intervene in this protest.  Because defendant has agreed to stay performance of the subject contract until the court resolves this protest on the merits, the court denied AAC's motion for a preliminary injunction as moot.

In accordance with the scheduling order in this case, defendant filed the administrative record (AR) on November 6, 2012.  Defendant then filed a motion to dismiss the complaint and a motion for judgment on the administrative record on December 4, 2012.  Plaintiff responded to the government's motions and filed its own cross-motion for judgment on the administrative record on January 3, 2013. Defendant filed its response and reply on January 25, 2013, and plaintiff filed its own reply on February 7, 2013.  The court heard oral argument from the parties on February 19, 2013.

**DISCUSSION**

**I.      Bid Protest Jurisdiction**

This court "shall have jurisdiction to render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement."  28 U.S.C. § 1491(b)(1) (2006).  The jurisdictional grant is

"without regard to whether suit is instituted before or after the contract is awarded." *Id.* As a threshold jurisdictional matter, however, the plaintiff in a bid protest must show that it has standing to bring the suit. *Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) (*ITAC*); *Myers Investigative & Sec. Servs., Inc. v. United States*, 275 F.3d 1366, 1369 (Fed. Cir. 2002).

In order to establish this court's jurisdiction in a bid protest action, the plaintiff must first demonstrate that it has been prejudiced by the alleged errors of procurement officials. *ITAC*, 316 F.3d at 1319 (citing *Am. Fed'n of Gov't Employees v. United States*, 258 F.3d 1294, 1302 (Fed. Cir. 2001) (*AFGE*)). In the absence of such prejudice, this court is without subject matter jurisdiction over the protest, regardless of whether the government's conduct was arbitrary, capricious, or contrary to law. The plaintiff in a bid protest suit must establish that it is an interested party with a direct economic interest in the procurement. *Id.* Bid protest standing is limited to those plaintiffs who are "'actual or prospective bidders or offerors whose direct economic interest would be affected by the award of the contract or by the failure to award the contract.'" *Weeks Marine, Inc. v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (quoting *AFGE*, 258 F.3d at 1302). In the context of a pre-award bid protest, a plaintiff must establish that it has suffered or will suffer a "non-trivial competitive injury which can be addressed by judicial relief." *Id.* at 1362. In a post-award bid protest, a plaintiff must prove that it would have a substantial chance of being awarded the contract if the alleged procurement errors were corrected. *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1307-08 (Fed. Cir. 2006).

## II.   Standards of Review

### A.   Motion to Dismiss under RCFC 12(b)(1)

In rendering a decision on a motion to dismiss for lack of subject matter jurisdiction pursuant to RCFC 12(b)(1), this court must presume all undisputed factual allegations to be true and must construe all reasonable inferences in favor of the plaintiff. *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), *abrogated on other grounds by Harlow v. Fitzgerald*, 457 U.S. 800, 814-15 (1982); *Reynolds v. Army & Air Force Exch. Serv.*, 846 F.2d 746, 747 (Fed. Cir. 1988). The relevant issue in a motion to dismiss under RCFC 12(b)(1) "'is not whether a plaintiff will

ultimately prevail but whether the claimant is entitled to offer evidence to support the claims.'" *Patton v. United States*, 64 Fed. Cl. 768, 773 (2005) (quoting *Scheuer*, 416 U.S. at 236). The plaintiff bears the burden of establishing subject matter jurisdiction, *Alder Terrace, Inc. v. United States*, 161 F.3d 1372, 1377 (Fed. Cir. 1998) (citing *McNutt v. Gen. Motors Acceptance Corp. of Ind.*, 298 U.S. 178, 189 (1936)), and must do so by a preponderance of the evidence, *Reynolds*, 846 F.2d at 748 (citations omitted). The court may look at evidence outside of the pleadings in order to determine its jurisdiction over a case. *Martinez v. United States*, 48 Fed. Cl. 851, 857 (2001) (citing *RHI Holdings, Inc. v. United States*, 142 F.3d 1459, 1461-62 (Fed. Cir. 1998); *Rocovich v. United States*, 933 F.2d 991, 993 (Fed. Cir. 1991)), *aff'd in relevant part*, 281 F.3d 1376 (Fed. Cir. 2002). "Indeed, the court may, and often must, find facts on its own." *Id.* If jurisdiction is found to be lacking, this court must dismiss the action. RCFC 12(h)(3).

### B.      Motion to Dismiss under RCFC 12(b)(6)

It is well-settled that a complaint should be dismissed under RCFC 12(b)(6) "when the facts asserted by the claimant do not entitle him to a legal remedy." *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002). When considering a motion to dismiss under this rule, "the allegations of the complaint should be construed favorably to the pleader." *Scheuer*, 416 U.S. at 236. "[W]hen the allegations in a complaint, however true, could not raise a claim of entitlement to relief," dismissal is warranted under RCFC 12(b)(6). *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 558 (2007). To survive a motion to dismiss for failure to state a claim, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555. While a complaint is not required to contain detailed factual allegations, it must provide "enough facts to state a claim for relief that is plausible on its face." *Id.* at 570. In order to meet the requirement of facial plausibility, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

### C.      Motion for Judgment on the Administrative Record

RCFC 52.1(c) provides for judgment on the administrative record. To review a motion, or cross-motions, under RCFC 52.1(c), the court asks whether,

13

given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1356-57 (Fed. Cir. 2005). The court must make factual findings where necessary. *Id.* The resolution of RCFC 52.1(c) cross-motions is akin to an expedited trial on the paper record. *Id.*

### D. Bid Protest Review

As the United States Court of Appeals for the Federal Circuit has stated, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A) [(2006)]: a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Banknote Corp. of Am. v. United States*, 365 F.3d 1345, 1350-51 (Fed. Cir. 2004) (citing *Advanced Data Concepts, Inc. v. United States*, 216 F.3d 1054, 1057-58 (Fed. Cir. 2000)). Under this standard, a procurement decision may be set aside if it lacked a rational basis or if the agency's decision-making involved a clear and prejudicial violation of statute, regulation or procedure. *Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1085-86 (Fed. Cir. 2001) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332-33 (Fed. Cir. 2001) (*Impresa*)).

The higher the degree of discretion allotted the contracting officer, the more difficult it is for a protestor to prove that the procurement decision was arbitrary or capricious. *Burroughs Corp. v. United States*, 617 F.2d 590, 597 (Ct. Cl. 1980) (citing *Keco Indus., Inc. v. United States*, 492 F.2d 1200, 1203-04 (Ct. Cl. 1974)). In addition, the court may not substitute its judgment for the agency's expertise in procuring services to meet the needs of the government. *See, e.g.*, *Ala. Aircraft Indus., Inc.-Birmingham v. United States*, 586 F.3d 1372, 1376 (Fed. Cir. 2009) (reversing this court when it "substitut[ed] . . . the court's judgment for the agency's with regard to how the contract work should be designed" (citing *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983))). Instead, the court must "determine whether the agency's . . . analysis [of proposals] was consistent with the evaluation criteria set forth in the [solicitation]." *Id.* at 1375-76 (citation omitted). The court will "sustain an agency action evincing rational reasoning and consideration of relevant factors." *Advanced Data Concepts*, 216 F.3d at 1058 (citation omitted).

"'If the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations.'" *Honeywell, Inc. v. United States*, 870 F.2d 644, 648 (Fed. Cir. 1989) (quoting *M. Steinthal & Co. v. Seamans*, 455 F.2d 1289, 1301 (D.C. Cir. 1971)). If, on the other hand, "the trial court determines [that] the government acted without rational basis or contrary to law when evaluating the bids and awarding the contract[,] . . . it proceeds to determine, as a factual matter, if the bid protester was prejudiced by that conduct." *Bannum*, 404 F.3d at 1351. Plaintiff again bears the burden of proof, and must "show that there was a 'substantial chance' [plaintiff] would have received the contract award but for the [government's] errors in the [procurement] process." *Id.* at 1358 (citations omitted). If a protestor can show that there was a substantial chance that it would have won the contract award but for the procurement errors of the agency, prejudice has been established. *Id.* at 1353 (citations omitted). "Prejudice is a question of fact." *Id.* (citing *Advanced Data Concepts*, 216 F.3d at 1057).

## III. Analysis of the Parties' Motions

Defendant has filed a motion to dismiss the complaint in this case under RCFC 12(b)(1) on the basis that plaintiff does not have standing to challenge the agency's set-aside decision or the ultimate award of the contract to TSS-Garco. Defendant also moves to dismiss the complaint under RCFC 12(b)(6), asserting that plaintiff waived its challenges to the agency's set-aside decision by waiting until after the contract was awarded to TSS-Garco before protesting the IFB. Plaintiff has moved for judgment on the administrative record under RCFC 52.1(c) based on the government's alleged violation of various FAR provisions in setting aside the contract for competition among 8(a) firms and in awarding the contract to an 8(a) firm that did not, according to plaintiff, satisfy responsibility criteria set forth in the IFB. In addition to its motion to dismiss the complaint, defendant has filed a cross-motion for judgment on the administrative record on the same issues raised by plaintiff.

Most of the challenges raised by plaintiff are pre-award in nature, in that they focus on the early decision to set aside the project for competition restricted to 8(a) firms alone. In addition to those pre-award challenges, however, plaintiff further asserts that the contract awardee, TSS-Garco, was not a responsible bidder.

15

In contrast to the challenges to the agency's decision to offer the procurement to the SBA, the objections to TSS-Garco's responsibility are post-award in nature.

## A. Motion to Dismiss under RCFC 12(b)(1)

In its motion to dismiss under RCFC 12(b)(1), defendant argues that plaintiff cannot establish competitive prejudice, and therefore does not have standing in this case, for three different reasons. First, defendant asserts that even if the Corps had not offered the contract to the SBA for inclusion in the 8(a) program, it would have been required to set the contract aside for small businesses under FAR 19.502-2. Second, defendant argues that a large business, such as AAC, does not have standing to challenge an agency's decision to compete a contract among 8(a) firms under FAR 19.805-1 because the alternative to a restricted competition would be the award of the contract to an 8(a) firm on a sole-source basis, not an open and unrestricted competition. Finally, defendant contends that plaintiff does not have standing to challenge the agency's conclusion that TSS-Garco was a responsible bidder because plaintiff would not have a substantial chance of award even if the court were to set aside the agency's responsibility determination.

First, defendant points to FAR 19.502-2, which states in relevant part that

> [t]he contracting officer shall set aside any acquisition over $150,000 for small business participation when there is a reasonable expectation that –
>
> (1)    offers will be obtained from at least two responsible small business concerns offering the products of different small business concerns . . . ; and
> (2)    award will be made at fair market prices.

48 C.F.R. § 19.502-2(b) (2012). Defendant argues that because the government had a reasonable expectation that two or more small businesses would submit bids on the contract if the agency were to remove the procurement from the 8(a) program, it had no discretion to allow large businesses, such as plaintiff, to

16

compete for the contract in an unrestricted competition.[8]  Defendant notes that the SBA identified thirteen qualified 8(a) firms in connection with this procurement, and that the agency determined through its own independent research that at least seven such firms were capable of performing the work contemplated under the contract.  Further, defendant notes that two small businesses submitted bids on the McNary Juvenile Fish Bypass Outfall Pipe Relocation Project (McNary Project), *see* AR at 1-4, 942, 974-87, which plaintiff has described as a "project[] [that] involved similar work to that required by the IFB – that is, the 'specialized work' of marine construction," *id.* at 2406.[9]  Because its market research has identified at least two responsible small business concerns, defendant argues that the removal of the protested procurement from the 8(a) program would result in a competition among small businesses – a competition for which plaintiff would be ineligible.

Defendant further argues that plaintiff does not have standing to challenge the agency's decision to award the contract based on a competition restricted to 8(a) firms under FAR 19.805-1, which provides that:

> (a)    Except as provided in paragraph (b) of this subsection, an acquisition offered to the SBA under the 8(a) Program shall be awarded on the basis of competition limited to eligible 8(a) firms if –
>
>     (1)    There is a reasonable expectation that at least two eligible and responsible 8(a) firms will submit offers and that award can be made at a fair market price; and
>
>     (2)    The anticipated total value of the contract, including options, will exceed $6.5 million

---

[8]/  There is a distinction between 8(a) small business concerns and small businesses. While all 8(a) firms are small businesses, not all small businesses are certified 8(a) firms.

[9]/  Defendant also notes that two 8(a) firms attended site visits for the Lower Monumental Juvenile Fish Bypass Outfall Pipe Relocation Project (Lower Monumental Project), which AAC identified as another complex marine construction project similar to the barge mooring project, while one 8(a) firm attended a site visit for the McNary Project.  *See* Def.'s Reply at 11 (citing AR at 942, 977, 986).  In addition, three non-8(a) small businesses attended site visits for one or both of those projects.  *See id.* (citing AR at 942, 977, 982-84).

17

> for acquisitions assigned manufacturing [NAICS] codes and $4 million for all other acquisitions.

48 C.F.R. § 19.805-1(a). Defendant explains that FAR 19.805-1 does not dictate when a contract may be offered to the SBA for inclusion in the 8(a) program, but instead addresses what happens *after* a contract has been offered and accepted into that program. When the government does not have a reasonable expectation that two or more eligible and responsible 8(a) firms will submit bids on the contract, it is still permitted to award the contract to an 8(a) firm on a sole-source basis. Because plaintiff is not an 8(a) firm, defendant argues, plaintiff lacks standing to challenge the agency's action here – whether that action was to compete the procurement among eligible and responsible 8(a) firms or to sole-source the contract to an eligible and responsible 8(a) firm.

Finally, defendant argues that plaintiff does not have standing to challenge the government's responsibility determination for TSS-Garco because plaintiff is ineligible for award. Because this aspect of AAC's protest is post-award in nature, plaintiff must demonstrate that it would have a substantial chance of being awarded the contract in the absence of the alleged procurement errors. *See Rex Service*, 448 F.3d at 1307-08. Defendant contends that even if the court were to hold that TSS-Garco does not meet the responsibility standards set forth in the IFB, plaintiff would still not have a substantial chance of contract award because it is ineligible for award of a contract set aside for 8(a) firms.

Defendant is correct that no single procurement error alleged by plaintiff has resulted in competitive harm to plaintiff, but that is not the appropriate inquiry in determining whether a protestor has standing for jurisdictional purposes. Rather, "a plaintiff must show that it would have had a substantial chance of being awarded the contract but for *the combined impact of all agency decisions alleged to be unlawful.*" *Linc Gov't Servs., LLC v. United States*, 96 Fed. Cl. 672, 696 (2010) (emphasis added and citations omitted). To the extent that AAC's inability to compete for the contract is the result of the alleged procurement errors, that inability is a non-trivial competitive injury. *See Weeks Marine*, 575 F.3d at 1362; *Distributed Solutions, Inc. v. United States*, 539 F.3d 1340, 1345 (Fed. Cir. 2008) (holding that the protestors possessed a direct economic interest in the procurement because they were deprived of the opportunity to compete for its requirements).

18

Further, if AAC were to succeed on all of the grounds set forth in its complaint, including plaintiff's contention that no 8(a) firms or other small businesses were capable of meeting the IFB's responsibility requirements, then plaintiff would be free to compete for the contract in an open and unrestricted competition. *See Assessment & Training Solutions Consulting Corp. v. United States*, 92 Fed. Cl. 722, 728 (2010) (*ATSCC*) (holding that a non-8(a) small business had standing to challenge the government's decision to set aside a contract for competition among 8(a) firms alone because it would be able to compete for the contract in any subsequent open or small-business competition).[10] Here, if the agency were required to hold an unrestricted competition for this procurement, plaintiff would in fact have a substantial chance of being awarded the contract. *See Rex Service*, 448 F.3d at 1307-08. AAC has significant experience in marine construction and has been awarded contracts for such work in the past. *See* AR at 970-71 (noting that AAC was awarded and has performed at least two specialized marine construction projects for the Corps in the past). The court concludes that plaintiff has standing in this case.

## B. Motion to Dismiss under RCFC 12(b)(6)

Defendant also argues that any challenges to the set-aside decision must be dismissed under RCFC 12(b)(6) because plaintiff failed to protest the IFB in this court until after the contract was awarded to TSS-Garco.[11] According to defendant, pursuant to *Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308, 1315 (Fed. Cir. 2007), plaintiff has waived any such arguments. In response, plaintiff argues that it did not waive any of its claims because it filed a timely agency-level protest and diligently pursued those claims thereafter. The court agrees with plaintiff.

---

[10]/ Defendant notes that this court held that the protestor in *ATSCC* could not establish competitive harm in its assertion that the government violated FAR 19.805-1, *see ATSCC*, 92 Fed. Cl. at 732, but that determination was contained in the court's analysis of prejudice on the merits, not in its preliminary analysis of jurisdictional standing. *See Linc*, 96 Fed. Cl. at 694-97 (discussing the two distinct analyses of prejudice required in bid protest cases).

[11]/ Defendant does not expressly state that its waiver arguments are included in its motion to dismiss under RCFC 12(b)(6), but the court notes that such arguments are not jurisdictional in nature. *See Linc*, 96 Fed. Cl. at 697-98.

19

In *Blue & Gold Fleet*, the Federal Circuit held that "a party who has the opportunity to object to the terms of a government solicitation containing a patent error and fails to do so prior to the close of the bidding process waives its ability to raise the same objection afterwards in a § 1491(b) action in the Court of Federal Claims." *Id.* In that case, the court explained the reason for the waiver rule:

> In the absence of a waiver rule, a contractor with knowledge of a solicitation defect could choose to stay silent when submitting its first proposal. If its first proposal loses to another bidder, the contractor could then come forward with the defect to restart the bidding process, perhaps with increased knowledge of its competitors.

*Id.* at 1314. Thus, the rule in *Blue & Gold Fleet* "prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation." *Id.*

The Federal Circuit did not hold, however, that a protestor must always file suit in this court before the closing date for the receipt of bids to avoid waiving its claims. In fact, this court has rejected precisely that interpretation of the waiver rule, explaining that the rule set forth in *Blue & Gold Fleet* "does not require a protester raising a solicitation impropriety to file suit before the closing date for the receipt of proposals, provided that timely challenges have first been made at the agency or before the GAO." *DGR Assocs., Inc. v. United States*, 94 Fed. Cl. 189, 194 (2010). The court went on to specifically state that

> [t]he correct interpretation of *Blue & Gold Fleet* is that, if a party has challenged a solicitation impropriety before the close of the bidding process, the party is not precluded from later filing its protest at the Court of Federal Claims. A party must do something before the closing date to preserve its rights, and must thereafter pursue its position in a timely manner.

20

*Id.* at 203. Thus, as a general rule, a party may preserve its rights by filing a protest with the agency or GAO, instead of this court, before the closing date for bidding.

In *Blue & Gold Fleet*, the protestor challenged an alleged infirmity in the procurement before GAO, but it waited to do so until the procuring agency had already selected a bidder for contract award, even though the protestor was aware of the basis of its protest prior to bid closing. That is not the situation in this case. Here, plaintiff filed a protest with the agency on August 7, 2012, and it filed supplemental protests on August 20, 2012, and on August 24, 2012. *See* AR at 961-1012. The initial protest was filed just one week after the issuance of the IFB, and more than three weeks before bids were due. The supplemental protests were also filed before the closing date for the receipt of bids. On August 28, 2012, the agency informed plaintiff that it intended to proceed with the opening of bids on August 30, 2012, but that it would not award the contract until after it had resolved AAC's protest.[12] *See* AR at 3097-98, 3103-05; *see also id.* at 937 (stating that while "the District will not award this contract until adjudication of the agency protest, it is proceeding with bid opening").

The agency denied AAC's protest on September 19, 2012, *see* AR Tab 33, and awarded the contract to TSS-Garco on the same day, *see id.* Tab 30. Plaintiff then filed a protest with GAO just two days later, on September 21, 2012, *see id.* Tab 34, and then filed a supplemental protest on September 24, 2012, *see id.* Tab 35. Plaintiff diligently prosecuted its protest before GAO until the protest was ultimately dismissed as untimely on October 11, 2012. *See id.* Tab 42. Finally, on October 15, 2012, only four days after the dismissal of its protest by GAO, plaintiff filed its bid protest complaint in this court, along with a motion for a preliminary injunction.

---

[12]/ There is some dispute as to the precise nature of the communications between the parties. Defendant asserts that it informed plaintiff that it was required to resolve the protest before contract award due to the regulatory stay requirement set forth in 48 C.F.R. § 33.103(f) (2012). *See* AR at 3103-04. Plaintiff, in contrast, claims that the agency implied that it was delaying the award of the contract because the agency was still considering whether to take corrective action in response to AAC's protest. *See id.* at 3098. These factual disputes do not, however, materially impact the issue addressed here.

In this case, there is no question that plaintiff "did something" before the closing date for the receipt of bids by filing a timely agency-level protest. Further, it is equally clear that plaintiff diligently pursued its position in a timely manner thereafter. In the months since its first protest to the agency, plaintiff has been continuously contesting the agency's set-aside decision in one forum or another. Plaintiff did not submit a bid to the government, "remain silent," and then protest the IFB for the first time when its offer was not accepted. Plaintiff has not waived any of its pre-award challenges under *Blue & Gold Fleet*.

Defendant argues that plaintiff did not pursue its claims in a timely manner following its initial protest to the agency because its appeal to GAO was untimely. That argument fails for a number of reasons. First, there is no requirement that a protestor pursue its claims before GAO prior to filing a bid protest in this court. *See* 31 U.S.C. § 3556 (2006) (stating that GAO's authority to review bid protests under the Competition in Contracting Act does not in any way "affect the right of any interested party to file a protest with the contracting agency or to file an action in the United States Claims Court"); 4 C.F.R. § 21.11(b) (2012) (requiring GAO to dismiss any protest in that forum when the matter is the subject of litigation in this court). Thus, despite defendant's assertion to the contrary, there is simply no requirement that a protestor "fully exhaust administrative remedies to avoid waiving its solicitation-based claim in this Court after the closing date for the receipt of bids." Def.'s Mot. at 16. The fact that GAO dismissed AAC's protest as untimely is irrelevant to this court's analysis of AAC's claims in this suit, and this court will not review GAO's decision in that regard. *See Advance Constr. Servs., Inc. v. United States*, 51 Fed. Cl. 362, 365 (2002) (noting the "well-settled principle that 'it is the agency's decision, not the decision of GAO, that is the subject of judicial review' when a bid protestor protests an award previously reviewed by GAO") (citations omitted).

Further, GAO dismissed AAC's protest as untimely under a regulation that does not apply to this court. *See* AR at 3113 (citing 4 C.F.R. § 21.2(a)(3) (2012)). In contrast to GAO, this court is not bound by any regulatory time limits for the filing of bid protests. *See DGR*, 94 Fed. Cl. at 201 ("Unlike agency-level or GAO protests, there are no regulatory time limits for filing at the Court."). Defendant cites the Federal Circuit's decision in *Comint Systems Corp. v. United States*, 700 F.3d 1377 (Fed. Cir. 2012), for the proposition that a protestor may not bring suit in this court if the protest would not be permitted under GAO regulations. *See*

Def.'s Notice of Supplemental Authority at 2 (citing *Comint*, 700 F.3d at 1383 ("It would be incongruous to bar later GAO protests but to permit a later court challenge.")). However, in *Comint*, as in *Blue & Gold Fleet*, the protestor did not take any protest action – in any forum – until after the closing date for bids. Indeed, the protestor in *Comint* did not file an agency-level protest until after the contracts were awarded.

*Comint*, moreover, did not establish a more rigorous approach to the waiver rule set forth in *Blue & Gold Fleet*. To the contrary, the court held that when an alleged error in the procurement is not apparent until after the closing date for bidding, the protestor does not waive its arguments as long as it raises them before the contract is awarded:

> To be sure, where bringing the challenge prior to the award is not practicable, it may be brought thereafter. But, assuming that there is adequate time in which to do so, a disappointed bidder must bring a challenge to a solicitation containing a patent error or ambiguity prior to the award of the contract.

*Comint*, 700 F.3d at 1382. The Federal Circuit's decision in *Comint* does not require a protestor to file suit in this court before the closing date for the receipt of bids, nor does it adopt GAO's timeliness regulations for this court.[13]

---

[13]/ Defendant cites this court's decision in *Esterhill Boat Service Corp. v. United States*, 91 Fed. Cl. 483 (2010), for the proposition that a pre-award, agency-level protest does not preserve a protestor's rights under *Blue & Gold Fleet* when the agency subsequently takes action that is adverse to the protestor's interests, such as accepting bids in accordance with the challenged solicitation, and the protestor does not immediately pursue its claims before GAO or this court. Plaintiff argues that *Esterhill* is distinguishable because the initial "protest" in that case was not a formal agency-level protest in accordance with FAR 33.103, but was instead an informal letter to the contracting officer. Defendant disputes that characterization of the initial protest. To the extent that the initial protest in *Esterhill* was an informal one, that case is distinguishable from this case. *See Contract Servs., Inc. v. United States*, 104 Fed. Cl. 261, 277 (2012) (noting that "even if [the protestor] had discussed the issue with [the contract specialist], an informal question to the Solicitation's contract specialist does not qualify as the type of objection or challenge contemplated by *Blue & Gold Fleet*"). However, to the extent that the initial protest in *Esterhill* was a formal one, that decision would then appear to be in some

continue...

In sum, plaintiff did not waive any of its claims in this case. AAC filed a timely protest with the agency before the closing date for bids, and it has continuously pursued its claims since that time, first at GAO and now before this court. Defendant's motion to dismiss the complaint on that basis must be denied.

## C.  Cross-Motions for Judgment on the Administrative Record

Plaintiff argues in its cross-motion that the government violated a number of regulatory provisions when it set aside the subject procurement for competition limited to 8(a) firms. First, plaintiff argues that the agency erred in its determination that TSS-Garco was a responsible bidder because the IFB contained special standards of responsibility that plaintiff contends no 8(a) firm could possibly meet. Next, plaintiff asserts that the government violated FAR 19.805-1 because it offered the subject procurement to the SBA without first determining that there were at least two 8(a) firms capable of meeting those responsibility standards. Plaintiff further argues that the government violated FAR 10.001 because it did not perform the market research necessary to support its decision to offer the procurement to the SBA for inclusion in the 8(a) program. Finally, plaintiff contends that the government failed to document its market research, as required under FAR 10.002. In its own motion for judgment on the administrative record, the government argues that none of its actions violated any provision of the FAR. For the reasons set forth below, the court agrees with the government.

### 1.  The IFB Does Not Contain Definitive Responsibility Criteria that Must Be Satisfied Before Award

AAC argues that the government was required to determine whether the lowest bidder met the definitive responsibility criteria set forth in the IFB before awarding the contract to that bidder. Plaintiff argues that the government never determined whether TSS-Garco actually met those criteria, and that no 8(a) firm possessed the requisite experience to meet them. Plaintiff, however, misinterprets the IFB, which does not contain any special standards of responsibility.

---

[13]/  ...continue
tension with this court's decision in *DGR*. Neither of those decisions is binding on this court, but the court finds the analysis set forth in *DGR* to be more persuasive in the circumstances of this case and will therefore follow it here.

The term "responsibility" is used to describe the ability of an offeror to successfully meet its obligations under a contract. The contracting officer must make a responsibility determination prior to award. *See* 48 C.F.R. § 9.103(b) (2012) ("No purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility."); *see also* John Cibinic, Jr. et al., *Formation of Government Contracts* at 411 (4th ed. 2011); Steven W. Feldman, *Government Contract Guidebook* at 134 (4th ed. 2008) ("[W]hile the responsiveness of a bid is determined at the time bids are opened, the responsibility of a prospective contractor is determined by the time of award of the contract."). There are two different kinds of contractor responsibility. First, there are general standards of responsibility, which are expressly set forth in the FAR and are applicable to all contractors. *See* 48 C.F.R. § 9.104-1 (2012). Second, in some procurements, there may also be "special standards of responsibility":

> When it is necessary for a particular acquisition or class of acquisitions, the contracting officer shall develop, with the assistance of appropriate specialists, special standards of responsibility. Special standards may be particularly desirable when experience has demonstrated that unusual expertise or specialized facilities are needed for adequate contract performance.

48 C.F.R. § 9.104-2(a) (2012). Importantly, "[t]he special standards shall be set forth in the solicitation (and so identified) and shall apply to all offerors." *Id.*

The GAO has explained the difference between the two types of responsibility:

> In most cases, responsibility is determined on the basis of what the FAR refers to as general standards of responsibility, such as adequacy of financial resources, ability to meet delivery schedules, and a satisfactory record of past performance and of business integrity and ethics. In some cases, however, an agency will include in a solicitation a special standard of responsibility, which is often referred to as a definitive criterion of responsibility. Definitive responsibility criteria are specific and

25

objective standards established by an agency as a precondition to award which are designed to measure a prospective contractor's ability to perform the contract.

*Vador Ventures, Inc.*, B-296394, 2005 CPD ¶ 155, 2005 WL 1876113, at *2 (Comp. Gen. Aug. 5, 2005) (citations omitted).

The IFB in the instant procurement set forth the requirements to be considered by the agency in determining whether a prospective contractor was a responsible bidder:

> **CONTRACTOR RESPONSIBILITY, PREAWARD SURVEY**
>
> In order to determine a contractor's responsibility for purposes of contract award the contractor is required to provide a statement regarding previous experience and past performance in performing comparable work, information related to the business organization, financial resources, and/or plant to be used in performing the work. (See the Attention to Bidders form included in this solicitation.) In accordance with FAR 9.104-1, to be determined responsible, a prospective contractor must –
>
> (a) Have adequate financial resources to perform the contract, or the ability to obtain them;
>
> (b) Be able to comply with the required or proposed delivery or performance schedule, taking into consideration all existing commercial and governmental business commitments;
>
> (c) Have a satisfactory performance record. (A prospective contractor shall not be determined responsible or non-responsible solely on the basis of a lack of relevant performance history except as provided in FAR 9.104-2);

(d) Have a satisfactory record of integrity and business ethics;

(e) Have the necessary organization, experience, accounting and operational controls, and technical skills, or the ability to obtain them;

(f) Have the necessary production, construction, and technical equipment and facilities, or the ability to obtain them;

(g) Be otherwise qualified and eligible to receive an award under applicable laws and regulations.

AR at 150. As noted in the IFB, these are the same general responsibility standards, virtually word for word, set forth in FAR 9.104-1.

The contractor responsibility section of the disputed IFB does not include any other responsibility standards, aside from those described above. However, plaintiff argues that provisions located in other sections of the IFB do contain definitive responsibility criteria that must be satisfied by the successful bidder prior to award. Specifically, part 1.6 in section 31 63 26.00 10 of the IFB provides the following with respect to contractor qualifications for drilled shaft experience:

### 1.6  CONTRACTOR QUALIFICATIONS AND EXPERIENCE

Drilled shafts shall be constructed only by a Contractor who has been regularly engaged in the performance of this type of specialized work. The Contractor shall have successfully completed large-diameter drilled shaft foundation projects, with an emphasis on those projects completed in-water, or demonstrate that the company has the key personnel from a former company in which these personnel successfully met the same requirements.

AR at 567.

Similarly, part 1.6 in section 31 63 26.00 20 of the IFB sets forth nearly identical language for the required contractor experience in casing installation for the mooring dolphin:

**1.6    CONTRACTOR QUALIFICATIONS AND EXPERIENCE**

The Mooring Dolphin shall be constructed only by a Contractor who has been regularly engaged in the performance of this type of specialized work.  The Contractor shall have successfully completed large-diameter casing foundation projects, with an emphasis on those project[s] completed in-water, or demonstrate that the company has the key personnel from a former company in which these personnel successfully filled the same role and successfully met the same requirements.

AR at 610.

Plaintiff argues that both of the sections noted above contain definitive responsibility criteria, and that the government was required to determine, before contract award, that TSS-Garco satisfied those requirements.  The court further notes that AAC's interpretation of those sections provides the foundation for each of its challenges to the government's set-aside decision.  Plaintiff argues that the Corps was required to determine, before offering the contract to the SBA, that at least two 8(a) firms met the experience requirements discussed above.  Plaintiff also asserts that the agency was required to perform market research regarding the ability of 8(a) firms to meet those requirements, and that the agency was required to document the results of its research on that issue.  Finally, plaintiff argues that the 8(a) firm may not rely on subcontractors, joint venturers, or post-award hires to meet those experience requirements.  Rather, according to plaintiff, the 8(a) firm must meet those requirements itself.  Plaintiff is incorrect on all counts.

First, as noted above, the IFB clearly sets forth the responsibility standards that apply in this case, and those standards do not include the experience requirements described above.  Rather, the responsibility standards in the IFB

28

closely track the general standards of responsibility set forth in the FAR. *Compare* AR at 150 *with* 48 C.F.R. § 9.104-1.

Second, the experience requirements referenced by plaintiff are contained in a section of the IFB addressing the post-award submittal process for the contractor. The IFB explains that the contractor must obtain government approval for the drilled shaft and casing installation experience described above in accordance with the submittal procedures of the IFB. *See* AR at 563, 607. Those procedures, in turn, require the contractor to prepare a schedule of its submittals within fifteen calendar days of receiving a notice to proceed with the project. *Id.* at 241; *see also id.* at 168 (requiring the contractor to commence work within ten days of receiving a notice to proceed).

Thus, the experience requirements described above cannot be viewed as responsibility requirements – either general or special – because they are not required to be satisfied by the contractor until after the contract is awarded. *See* 48 C.F.R. § 9.103(b) (2012) ("No purchase or award shall be made unless the contracting officer makes an affirmative determination of responsibility."); *Centech Grp. v. United States*, 554 F.3d 1029, 1034 n.2 (Fed. Cir. 2009) ("Responsibility refers to an offeror's apparent ability and capacity to perform all contract requirements and is determined, not at proposal opening, but at any time prior to award of the contract based on any information received by the agency up to that time."); *Advanced Tech. Sys.*, B-296493.6, 2006 CPD ¶ 151, 2006 WL 2975357, at *3 (Comp. Gen. Oct. 6, 2006) ("The concept of responsibility expressly applies to 'prospective contractors' – not 'current' or 'existing' contractors – a limitation that is repeated throughout the applicable statutes and regulations, and that indicates that the requirement for a responsibility determination applies before award of a contract.") (citations omitted); *Matter of Charter Environmental, Inc.*, B-297219, 2005 CPD ¶ 213, 2005 WL 3288200, at *2 (Comp. Gen. Dec. 5, 2005) (noting that definitive responsibility criteria "must be met as a precondition to award").

Plaintiff also argues that responsibility standards are not required to be located in any particular section of the IFB, and that "the substance of the provision, not its label or location in the IFB, determines whether it is a definitive responsibility criterion." Pl.'s Reply at 11. However, FAR 9.104-2 states that special standards of responsibility "shall be set forth in the solicitation (*and so*

*identified*), and shall apply to all offerors." 48 C.F.R. § 9.104-2(a) (emphasis added); *see also News Printing Co. v. United States*, 46 Fed. Cl. 740, 746 (2000) ("Two characteristics thus mark . . . definitive responsibility criteria. They must be specific and objective, and the bidders have to be warned of them."). Because the experience requirements were not contained in the responsibility section of the IFB and were not otherwise specified as responsibility standards, the court may not treat them as responsibility standards.

An additional contention set forth by plaintiff is based largely on this court's earlier decision in *Chas. H. Tompkins Co. v. United States*, 43 Fed. Cl. 716 (1999). AAC contends that a procuring agency may actually establish definitive responsibility criteria even if it had no intention of doing so. That argument is inapposite for two reasons. First, the government's intent is not at issue in this case; rather, the court concludes, based on the language and structure of the IFB, that the contractor experience sections cited by plaintiff are not responsibility standards. Moreover, in *Chas. H. Tompkins*, there was no dispute over whether the provisions at issue were responsibility standards; rather, the disagreement between the parties turned on whether those responsibility standards were general or special. *See id.* at 717 (quoting language from the solicitation indicating that "[t]his information will be used by the Government to assist in its determination of responsibility in accordance with Subpart 9.1 of the FAR"), 720 (noting that the plaintiff in that case "view[ed] the disputed provision . . . as setting forth definitive responsibility criteria or special standards as described in FAR 9.104-2, while the government characterize[d] the same provision as setting forth general responsibility standards as described in FAR 9.104-1"). Here, the court holds that the experience requirements cited by plaintiff are not responsibility standards, either general or special, at all.

Finally, plaintiff argues that the successful bidder must meet the experience requirements for drilled shafts and casing installation itself, and may not rely upon subcontractors or new hires for that purpose. First, because those requirements are not responsibility standards, but matters of post-award contract administration, plaintiff cannot challenge any contractor's alleged inability to meet those requirements in this bid protest. *See Diversified Maint. Sys., Inc. v. United States*, 103 Fed. Cl. 431, 436-37 (2012) (noting that disputes between a current contractor and the government that are based on matters of post-award contract administration may not be resolved in the context of a bid protest). Further, AAC's arguments in

this regard are based on an unreasonable reading of the IFB, under which the term "Contractor" is read to refer only to the prime contractor, while "contractor" may be read to refer to either the prime contractor or one of its subcontractors. The interpretation urged by plaintiff is problematic in a number of respects. For example, the SBA is technically the prime contractor on this contract, while the 8(a) firm is the SBA's subcontractor. *See* AR at 174. In addition, the IFB uses the term "8(a) Contractor" – rather than simply "Contractor" – to refer to the 8(a) firm. *See id.* at 174-75. Further, the first sentence of the two sections referenced by plaintiff as containing definitive responsibility criteria do not refer to "the Contractor," as plaintiff suggests, but to "a Contractor." *See id.* at 567, 610. Subsequent references to "the Contractor" in those sections of the IFB are most naturally read to refer to the party referenced in the first sentence (*i.e.*, "a Contractor"), which could, in turn, refer to either the 8(a) firm or a subcontractor. Finally, the general responsibility standards set forth in the "Contractor Responsibility, Preaward Survey" section of the IFB – which are the only responsibility requirements in the entire IFB – contemplate the use of subcontractors or new hires to perform the technical aspects of the contract. For example, the 8(a) firm must

> (e)     Have the necessary organization, experience, accounting and operational controls, and technical skills, *or the ability to obtain them*; [and]
>
> (f)      Have the necessary production, construction, and technical equipment and facilities, *or the ability to obtain them.*

AR at 150 (emphasis added). AAC's interpretation of the IFB is contradicted by its plain terms.

In sum, the court concludes that the contractor experience requirements for drilled shafts and casing installation are not standards of responsibility that must be satisfied prior to contract award. The only responsibility standards in the IFB are the general standards set forth in the section entitled "Contractor Responsibility, Preaward Survey." *See* AR at 150. The agency determined that TSS-Garco met those standards, *see id.* at 1153-55, and plaintiff has not challenged that finding in this case. For that reason, the government is entitled to judgment with respect to AAC's post-award challenge to TSS-Garco's responsibility.

## 2. The Government Did Not Violate FAR 19.805-1

Plaintiff argues that the government violated FAR 19.805-1(a), which states:

(a)     Except as provided in paragraph (b) of this subsection, an acquisition offered to the SBA under the 8(a) Program shall be awarded on the basis of competition limited to eligible 8(a) firms if –

(1)     There is a reasonable expectation that at least two eligible and responsible 8(a) firms will submit offers and that award can be made at a fair market price; and

(2)     The anticipated total value of the contract, including options, will exceed $6.5 million for acquisitions assigned manufacturing [NAICS] codes and $4 million for all other acquisitions.

48 C.F.R. § 19.805-1(a).

When the agency does not have a reasonable expectation that two or more eligible and responsible 8(a) firms will submit offers on the procurement, the agency may award the contract to an 8(a) firm on a sole-source basis:

(b)     Where an acquisition exceeds the competitive threshold, the SBA may accept the requirement for a sole source 8(a) award if –

(1)     There is not a reasonable expectation that at least two eligible and responsible 8(a) firms will submit offers at a fair market price; or

(2)     SBA accepts the requirement on behalf of a concern owned by an Indian tribe or an Alaskan Native Corporation.

48 C.F.R. § 19.805-1(b).

Plaintiff argues that this section requires the procuring agency to determine that two or more 8(a) firms are eligible and responsible and will submit offers on a procurement *before* that procurement is offered to the SBA for inclusion in the 8(a) business development program. That argument is flawed for at least two reasons.

First, plaintiff misreads the clear language of FAR 19.805-1, which does not require a procuring agency to evaluate the responsibility of 8(a) firms before an acquisition is offered to the SBA. Rather, that section addresses when a procurement that has already been offered to the SBA must be awarded on the basis of competition among 8(a) firms and when it may be awarded on a sole-source basis. *See ATSCC*, 92 Fed. Cl. at 732 (noting that FAR 19.805-1 "does not provide for two separate offers but rather directs how an acquisition is to be awarded once it is 'offered to the SBA under the 8(a) Program'"); *see also* 13 C.F.R. § 124.506(a)(2) (2013) (stating, in an SBA regulation that largely tracks the language of FAR 19.805-1, that "[a] procurement *offered and accepted for the 8(a) BD program*" must be competed among 8(a) firms when the requirements are met) (emphasis added). AAC's interpretation of FAR 19.805-1 is based on cases that interpreted different regulations. *See, e.g.*, *RhinoCorps Ltd. v. United States*, 87 Fed. Cl. 261, 279-80 (2009) (discussing the "rule of two" established by FAR 19.502-2); *JT Constr. Co.*, B-254257, 93-2 CPD ¶ 302, 1993 WL 505803, at *3-*4 (Comp. Gen. Dec. 6, 1993) (discussing the set-aside requirement established by DFARS § 219.502-2-70(a)).

Here, since the challenged procurement was above the competitive acquisition threshold of $4 million, FAR 19.805-1 required the Corps to compete the challenged procurement among 8(a) firms as long as it possessed a reasonable expectation that at least two eligible and responsible 8(a) firms would submit offers, and that an award to one of those firms could be made at a fair market price. In the absence of such an expectation, the alternative to an 8(a) competition was a sole-source award to an 8(a) firm, not a full and open competition as plaintiff suggests. *See ATSCC*, 92 Fed. Cl. at 732 ("Because the contracting agency had already determined that it would offer the requirement to the SBA for the 8(a) program, the agency's alternative to a competitive 8(a) award would be a sole-source 8(a) award.").

Finally, even if the court were to accept, *arguendo*, the interpretation now advanced by plaintiff, the SBA – the entity responsible for determining whether an

8(a) firm is eligible for contract award – informed the Corps that no fewer than thirteen 8(a) firms were qualified to perform the contract. In addition, the Corps identified seven qualified 8(a) firms through its own independent research. Because the agency identified two or more eligible and responsible 8(a) firms, the agency did not violate FAR 19.805-1, even under the incorrect interpretation of that section advanced by plaintiff here.

### 3. The Government Did Not Violate FAR 10.001

Plaintiff argues that the government violated section 10.001 of the FAR, 48 C.F.R. § 10.001 (2012), which requires each procuring agency to "[c]onduct market research appropriate to the circumstances . . . before developing new requirements documents for an acquisition by that agency," *id.* § 10.001(a)(2). That section further provides that the results of the agency's market research should be used to "[d]etermine if sources capable of satisfying the agency's requirements exist." *Id.* § 10.001(a)(3)(i). However, "[w]hen conducting market research, agencies should not request potential sources to submit more than the minimum information necessary." *Id.* § 10.001(b).

The court first notes that the Small Business Act "affords the SBA and contracting agencies broad discretion in selecting procurements for entry to the 8(a) program." *MCB Lighting & Elec.*, B-406703, 2012 CPD ¶ 206, 2012 WL 2878575, at *2 (Comp. Gen. July 13, 2012); *see also Data Transformation Corp. v. United States*, 13 Cl. Ct. 165, 173 (1987) ("Judicial intrusion into the procurement process is generally infrequent, limited and circumspect. The discretion inherent in the section 8(a) contractor selection process requires even greater judicial restraint.") (citations omitted).

In a similar vein, the agency enjoys substantial discretion in determining how much and what type of market research is "appropriate to the circumstances" for the purpose of "[d]etermin[ing] if sources capable of satisfying the agency's requirements exist." 48 C.F.R. § 10.001(a). For example, in *ATSCC*, the agency issued a 'sources sought notice' to determine whether there were any 8(a) firms qualified to perform a contract for medical training services. Based on the responses to that notice, the agency determined that only one such firm was qualified and offered the contract to the SBA for award on a sole-source basis. The SBA subsequently provided the agency with the name of a second 8(a) firm

and therefore, the agency elected to proceed with a competition restricted to 8(a) small businesses. The incumbent contractor, a non-8(a) small business, argued that neither the information requested in the 'sources sought notice,' nor the information received in response to that notice, was sufficient to determine whether there were two or more 8(a) firms capable of performing the contract. This court rejected that challenge to the adequacy of the agency's market research:

> Given this regulatory guidance and the discretion afforded agencies and contracting officers in making such procurement-related determinations, the court cannot conclude that the market research conducted by the Contracting Officer was inadequate nor that the Contracting Officer's 8(a) set-aside decision was unreasonable.

*ATSCC*, 92 Fed. Cl. at 731.

Here, Mr. Beckstrand attended a number of small business conferences; he discussed the possibility of setting aside the project for 8(a) participation with SBA representatives; he met with eighteen 8(a) firms and other small businesses to discuss their marine construction capabilities; he identified seven 8(a) firms that would be able to complete a marine construction project; he obtained the names of thirteen qualified 8(a) firms from SBA representatives in Seattle and Boise; and he performed further research on those firms. Plaintiff argues that the facts in *ATSCC* are distinguishable from the facts in this case because the agency there issued a 'sources sought notice.' Nothing in this court's decision, however, suggests that such a notice is a *sine qua non* of market research. Although the protestor in that case argued that the 'sources sought notice' and the responses to that notice were both inadequate for the agency's purposes, this court did not engage in an intrusive scrutiny of either the notice or the responses. The court cannot conclude here that the agency's market research was either unreasonable or inadequate.

### 4. The Government Did Not Violate FAR 10.002

Finally, plaintiff argues that the government violated section 10.002(e) of the FAR, which provides that "[a]gencies should document the results of market research in a manner appropriate to the size and complexity of the acquisition."

48 C.F.R. § 10.002(e). Plaintiff asserts that the Corps did not adequately document its research into whether two or more 8(a) firms were capable of performing the contract. That argument fails for at least three reasons.

First, as discussed above, the asserted "requirement" that the government determine whether there are at least two responsible 8(a) firms before offering a contract to the SBA for inclusion in the 8(a) program is based on a misreading of applicable regulations. The court will not require the agency to demonstrate adequate documentation of market research to support a nonexistent requirement.

In addition, the language of section 10.002(e) is precatory in nature and does not establish any mandatory documentation requirement. That section states that agencies "should" document the results of their market research; it does not state that those agencies "shall" do so. Plaintiff acknowledges that its proffered reading of FAR 10.002 is unsupported by any legal authority, but it attempts to draw an analogy between that section and other purportedly similar regulations. However, each of the regulations cited by plaintiff imposes a clear duty on the agency. *See, e.g.*, 48 C.F.R. § 15.308 (2012) (stating that a source selection authority's "decision *shall* be based on a comparative assessment of proposals against all source selection criteria in the solicitation . . . [and] *shall* be documented, and the documentation *shall* include the rationale for any business judgments or tradeoffs made or relied on by the SSA") (emphases added).

Finally, the administrative record demonstrates that the agency documented its market research. *See* AR at 5-8 (correspondence between Mr. Beckstrand and the SBA regarding the capabilities of 8(a) firms in Washington and Idaho), 857-59 (e-mail to TASB members listing the 8(a) firms identified by the SBA), 860-62 (e-mail from Mr. Beckstrand to agency counsel describing the steps leading to his decision to set aside the procurement for 8(a) participation), 864-89 (spreadsheet compiling the identity, capabilities, and other information on 8(a) firms). Thus, the court concludes that the government did not violate FAR 10.002 in this case.

## CONCLUSION

The court concludes that plaintiff has standing in this case and did not waive any of its arguments under *Blue & Gold Fleet*. For that reason, defendant's motion to dismiss the complaint is denied. However, the court further holds that the Corps

36

did not violate any of the regulatory provisions cited by plaintiff, nor did it err in concluding that TSS-Garco was a responsible bidder. For those reasons, defendant's motion for judgment on the administrative record is granted, and AAC's cross-motion for judgment on the administrative record is denied. Accordingly, it is hereby **ORDERED** that

(1)    Defendant's Motion to Dismiss or, in the Alternative, for Judgment upon the Administrative Record, filed December 4, 2012, is **DENIED** in part, as it relates to the motion to dismiss, and **GRANTED** in part, as it relates to the motion for judgment on the administrative record;

(2)    Plaintiff's Cross-Motion for Judgment on the Administrative Record, filed January 3, 2013, is **DENIED**;

(3)    The Clerk's Office is directed to **ENTER** final judgment in favor of defendant, dismissing the complaint with prejudice;

(4)    On or before **May 24, 2013**, counsel for the parties shall **CONFER** and **FILE** with the Clerk's Office a **redacted copy** of this opinion, with any material deemed proprietary marked out and enclosed in brackets, so that a copy of the opinion can then be prepared and made available in the public record of this matter; and

(5)    Each party shall bear its own costs.


/s/Lynn J. Bush        
LYNN J. BUSH
Judge